**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LAWRENCE PEET,** | : | **Civil No. 3:10-CV-482** |
| | : | |
| **Plaintiff** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **v.** | : | |
| | : | |
| **JEFFREY A. BEARD, et al.,** | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM  OPINION

## I.    INTRODUCTION AND STATEMENT OF THE CASE

On March 16, 2008, at around 10:00 p.m., Lawrence Peet, an inmate in the

custody of the Pennsylvania Department of Corrections previously housed at the State

Correctional Institution at Camp Hill, suffered the second of two seizures that day

while he was lying on his bunk, which was situated next to a scalding hot radiator.

After his second seizure of the day, Peet collapsed out of his bed and became trapped

against the radiator, with his face in direct contact with the burning surface.  The

record indicates that a frantic scene then ensued within the cell and on the cell block,

with Peet's cellmate screaming for help and other inmates causing a commotion.

Nevertheless, according to some evidence in the record, the response to the

emergency was slow, and it took anywhere from five to ten minutes before

corrections officers arrived at the cell door.  Meanwhile, Peet was convulsing, spitting up blood, all the while with his face pinned against the radiator for as long as 15 minutes before corrections officers entered the cell and provided aid.  Although the parties dispute whether corrections officers responded adequately under the circumstances, what is not disputed is that by the time correctional officers arrived, Peet's face had been in direct contact with the radiator for several minutes, and the results were ghastly:  Peet suffered extreme burns, facial disfigurement, and permanent blindness in his right eye.  He required extensive hospitalization in a burn unit and had multiple surgeries, including skin grafts.

Peet commenced this civil action on March 3, 2010, asserting claims against more than 50 DOC officials and employees.  Peet alleged that the defendants violated his constitutional rights through their deliberate indifference to his epileptic condition, in violation of the Eighth Amendment to the United States Constitution, and that their indifference resulted in Peet suffering his second seizure unsupervised in a cell, and resulted in Peet sustaining severe injury.  Peet also alleged that the defendants violated his due process rights under a "state created danger" theory of liability, asserting that the defendants affirmatively acted in a manner that exposed to Peet a foreseeable and increased risk of serious harm that later ensued.

The parties subsequently engaged in extensive discovery. Following this process, and the exchange of expert reports, Peet agreed to dismiss all but five of the original defendants, whom he determined had direct involvement in the constitutional deprivations alleged. Following this stipulated dismissal, Peet continues to assert his claims against the former Superintendent of SCI-Camp Hill, John Palakovich; Unit Manager Renee Zobitne; Sergeant Scott Seese; and Corrections Officers David Pierre and Manda Steinour-Eger (collectively, the "defendants"). Peet seeks to hold Palakovich and Zobitne liable for the alleged constitutional violations based upon their asserted failures as supervisors, and their own deliberate indifference to policies and procedures that exacerbated his risk of injury. Peet's claims against the remaining three defendants are based on his allegation that they were indifferent to the risk of harm that Peet faced by returning to his prison cell that contained a hot radiator after suffering a serious seizure; and that they responded in a dilatory and indifferent manner after Peet suffered the seizure that resulted in his severe injuries.

The remaining defendants have moved for summary judgment on Peet's claims, and the motion is fully briefed. Upon consideration, the motion will be granted in part and denied in part.

## II.   **FACTUAL BACKGROUND**[1]

On or around January 11, 2008, Lawrence Peet was transferred from the Lancaster County Jail to SCI-Camp Hill.  During his initial intake at the state prison, Peet was subjected to a physical examination, after which it was noted that Peet was 5' 9" and weighed 360 pounds.  He presented with a history of coronary artery disease, having suffered a heart attack in 1995.  The records suggest that Peet had a constellation of serious medical challenges, as it was also noted that he suffered from hypertension, chronic venous insufficiency, obesity, and lymphedema.  (Doc. 92, Ex. 4.)

On March 7, 2008, Peet suffered a seizure at SCI-Camp Hill.  The seizure was serious enough that it required him to be transported from the prison to Holy Spirit

---

[1] The parties have submitted voluminous evidentiary records to the Court, and have offered competing statements of fact.  Although the defendants seem to suggest that the Court should ignore some factual evidence in the record that the plaintiff identified, or that the plaintiff should not be permitted to interpose facts that are not directly responsive to assertions that the defendants have made, we disagree.  The familiar standard applicable to summary judgment practice requires that we consider the evidence in the record in the light most favorable to the non-moving party, and resolve reasonable inferences in his favor.  Summary judgment is appropriate only if there is no evidence in the record to support the plaintiff's version of the events alleged, and to support the claims asserted.  The plaintiff has presented a factual narrative, with supporting evidence, that provides some factual support for his deliberate indifference claims, and we present that factual narrative as the background to this case for purposes of resolving the pending motion only.  The plaintiff, of course, bears the burden of proof on all elements of his remaining claims.

Hospital for follow-up care.  Also as of this date, a document prepared at SCI-Camp Hill indicated that around this time it was known that Peet suffered from "seizure disorder."  (Id., Ex. 6.)

While at Holy Spirit, Peet suffered another seizure that lasted approximately two minutes.  (Id., Ex. 7.)  Dr. Alan C. Teplis, who treated Peet, noted that Peet had a "history of seizure disorder."  Peet stayed at Holy Spirit under the care of physicians until March 11, 2008, when he was returned to SCI-Camp Hill.  (Id., Ex. 8.)  At this time, Peet was medically evaluated by staff at the prison, and was admitted to the infirmary and prescribed anti-seizure medication.  (Id., Ex. 9.)  The following day, Peet was discharged and returned to his cell on the prison's A-block.  Despite having Peet returned to his cell, Dr. Barry Beaven noted on Peet's medical chart that he "need[ed] follow-up for seizures," and he requested Peet's records from Holy Spirit. (Id., Ex. 10.)

Peet was housed in cell B1-16, which was located on the bottom tier of A-block.  (Id., Ex. 11.)  Peet was celled with Allen James Reeves, with Peet using the bottom bunk and Mr. Reeves having the top.  The cell measured roughly 6' 10" in width by approximately 11' 5" in length.  (Id., Ex. 13.)  The cell also contained a radiator that was situated adjacent to Peet's bunk.  Evidence in the record indicates that the radiators in the cells at the prison would sometimes reach temperatures

sufficient to allow inmates to boil water for coffee.  (Doc. 92, Ex. 12, Dep. of Allen Reeves, at 33.)

On March 16, 2008, nine days after Peet suffered his first seizure that required his transfer to Holy Spirit Hospital, at approximately 7:15 p.m., Peet suffered another seizure while in his cell.  At that time, Reeves was in the cell with Peet, and during his deposition described what he witnessed.  Reeves attested that he was in his bunk reading a book when the entire bunk frame began shaking.  (Id., Ex. 12, Reeves Dep. at 11-12.)  Reeves hopped off the bed and saw that Peet's "tongue was kind of hanging out of his mouth a little bit and his eyes were rolling back into his head."  (Id. at 12.)  Reeves perceived that Peet required help, and thus got "on the door" and began banging on the gate and yelling down the tier in an effort to alert unit staff that there was an emergency that required immediate attention.  (Id. at 12, 22-25.)  During this time, Reeves heard other inmates also shouting and yelling, even cynically encouraging Reeves to simply "let [Peet] die."  (Id. at 23.)  Reeves further testified that despite his shouting and the noise that was building in the unit, it took between five and ten minutes for corrections officers to reach the cell door.   According to Reeves, it took as much as an additional 7 minutes before medical personnel arrived to render care.

6

Sergeant Scott Seese and Corrections Officers David Pierre and Amanda Steinour-Eger were on-duty on A-block from 2:00 p.m. to 10:00 p.m. on March 16, 2008. (Doc. 92, Ex. 14.) Sergeant Seese testified that he responded to Peet's first seizure, and that when he encountered Peet he was "laying there with eyes wide open and kind of panting." (Doc. 92, Ex. 15, Dep. of Scott Seese, at 26.) Thereafter, Nurse Jane Ann Snyder responded and assessed Peet in the cell for between 5 and 10 minutes, before Peet was taken by wheelchair to the dispensary for further follow-up and evaluation. (Doc. 92, Ex. 15, Seese Dep. at 27, 37; Ex. 17, Dep. of Jane Ann Snyder, at 84-86.)

Approximately 30 minutes later, Nurse Marcie Boyer determined that Peet could be returned to his cell via wheelchair. (Doc. 92, Ex. 18, Dep. of Marcie of Boyer, at 83, 85-86; Ex. 12, Reeves Dep. at 13, 28, 36; Ex. 15, Seese Dep. at 47, 64.) Reeves testified that he was surprised to see Peet return so soon after suffering a seizure that had left him looking "delirious." (Id., Ex. 12, Reeves Dep. at 13.) Reeves expressed his own opinion that Peet might still require medical attention or at least supervision, but Reeves's concerns were not persuasive, and Peet was returned to the cell. (Id. at 13, 28.) At this point, staff apparently departed.

Three hours later, at approximately 10:00 p.m., trouble struck when Peet suffered his second seizure of the day, and his second seizure in three hours. (Doc.

7

92, Ex. 20.)  Reeves again felt the bunk shaking, and when he jumped down realized

that Peet was in the midst of another fit.  (Doc. 92, Ex. 12, Reeves Dep. at 13, 31-32.)

During this seizure, however, Peet fell out of his own bunk and his head became

wedged in the space between the bottom of his bunk and the hot radiator.  (Id., at 14,

32-33.)  Reeves tried to render assistance to his cellmate, but was unable to move Peet

because of his size and weight and perhaps the way in which he was trapped.  Reeves

testified that Peet was shaking and spitting up blood.  After attempting to help Peet

for a minute, Reeves went to the door and began screaming and yelling to alert

correctional staff about the emergency taking place in the cell.  Once again, other

inmates on the block created a loud commotion in response.  (Id., at 14-15, 34, 61.)

Reeves testified that despite his yelling and the noise created by other inmates,

it again took another 5 to 10 minutes for staff to respond - despite the fact that Peet

had suffered a seizure just hours earlier.  And the circumstances of this particular

seizure were tragic due to Peet having become trapped against a scalding radiator

until staff came to his assistance as many as 15 minutes after the seizure started.  (Id.

at 15, 60, 64.)  After correctional officers first arrived, Reeves testified that they took

no immediate action, allowing as many as 5 more minutes to elapse before they

opened the cell door to provide assistance.  (Id. at 15.)  Thus, according to Reeves,

Peet's face remained pinned against the radiator for 15 minutes before it was removed

and medical treatment could be provided.  At this point, when the officers notified

medical that Peet needed attention, Reeves said Peet "wasn't moving anymore."  (Id.)

As it happens, only minutes before Peet suffered his second seizure, Sergeant

Seese was making the final rounds of his shift before he finished work at 10:00 p.m.

During rounds at approximately 9:50 p.m., Seese stopped by Peet's cell and told him

that he would notify the next shift about his medical condition and about the seizure

he had suffered earlier that day.  At that time, Seese recalls that Peet told him he felt

"groggy".  (Doc. 92, Ex. 15, Seese Dep. at 28-29.)  Seese then left to complete some

end-of-shift paperwork.  Approximately two minutes later, Seese heard that "a ruckus

was going on back in the cellblock.  Inmates were screaming, yelling, needed help."

(Id.)

According to Seese, he responded to the commotion within a minute of hearing

yelling by other inmates and Reeves; his testimony is contradicted by that offered by

Reeves, who claims it took at least five minutes before anyone arrived at the cell

door.  Seese states that he was the first staff member to arrive, and that he turned

lights on in the unit and notified medical staff that an emergency required their

assistance.  (Id. at 42, 51-52, 81-82.)  Seese stated that he  could see Peet lying face

down in the cell, and that it appeared the inmate might be vomiting blood, and had

blood coming from his face.   (Id.)   Despite calling for medical attention and

9

witnessing what appeared to be a seriously injured inmate, Seese did not enter the cell, but waited outside the cell for medical personnel to arrive.  (Id.)

Nurses Douglas McKinney and Lynn Joseph Overbaugh responded to the block to provide emergency care.  (Doc. 92, Ex. 16.)  Nurse McKinney testified that when they arrived at the cell, Peet remained in the midst of a seizure, was nonresponsive, and was convulsing.  (Doc. 92, Ex. 21, Dep. of Douglas McKinney, at 50-51.)  After medical entered the cell, Peet was removed from the radiator, and was dragged out of the cell atop a sheet that had been tucked beneath him.  (Id. at 35, 54-56, 58.)  Peet's seizure continued for another 3 to 4 minutes, during which time Nurse McKinney remained at a distance from Peet and phoned the dispensary for a gurney.  (Id. at 61-62.)

Peet's injuries were determined to be quite serious, and he was accordingly transported by ambulance to the Hershey Medical Center.  During his transport, Peet reportedly seized again, as notes indicate that at that time he had been in the throes of a "tonic/colonic seizure."  (Doc. 92, Ex. 22.)  One of the doctors at Hershey Medical Center, Dr. Daniel K. French, wrote notes indicating that Peet presented with severe burns sustained during the course of a seizure and contact with a radiator that lasted upwards of 30 minutes; though it is unclear how the doctor would have been capable of determining the duration of the contact.   Dr. French noted that Peet had

serious burns on the right side of his face, his left arm, his right eye, and had additionally suffered a C2 fracture. (Id., at 1-2.) During this initial assessment, it was determined that the severity of Peet's burns necessitated a transfer to the Lehigh Valley Hospital Burn Center for proper care. It appears that corrections staff initially balked at Dr. French's referral to the burn hospital, but relented after he insisted that such acute treatment was imperative. (Id., at 2-3.) According to Peet, the delay in his transfer subjected him to additional pain and suffering. (Doc. 90, at 10 n.5.)

Upon his admission at Lehigh Valley Hospital Burn Center, Peet was given last rites, though he did recover following a lengthy period of treatment and convalescence. Peet was treated at the facility for approximately six weeks, and was discharged on April 29, 2008. (Doc. 92, Ex. 24.) During his stay at the burn center, Peet had several surgeries performed on him to treat 2nd and 3rd degree burns, including skin grafts, which resulted in permanent scarring and loss of vision in his right eye. (Doc, 92, Ex. 25.)

Less than two years later, Peet initiated the instant action, alleging that the defendants' decision to allow him to be placed unsupervised in a cell with a scalding radiator during a time when he had been suffering regular seizures constituted deliberate indifference to his serious medical needs of which the defendants were, or should have been aware; and that their response to his emergency situation following

11

the second seizure also demonstrated deliberate indifference in the face of a desperate situation that resulted in Peet sustaining ghastly injuries.  Peet also alleges that the defendants' conduct was so egregious that it violated Peet's substantive due process rights, as he claims that the defendants are liable under the state created danger doctrine because they created the harm, or enhanced a known risk of danger that ultimately caused Peet's burn injuries.

Following discovery, the defendants have moved for summary judgment on all of Peet's claims.  The defendants contend that any serious risk of injury to Peet from being placed in a cell with a hot radiator was not foreseeable, and thus argue that based on the evidence in the record no jury could reasonably conclude that the defendants were deliberately indifferent to Peet's medical needs or that they affirmatively increased Peet's risk of suffering a foreseeable harm.   The defendants also argue that the facts of record, taken in the light most favorable to Peet, do not support a claim that anyone responding to Peet's emergent medical situation exhibited deliberate indifference, or responded in a dilatory or otherwise inappropriate manner. In large measure, the defendants not only defend their own conduct and the adequacy of their training and response, but they also blame Peet for failing to file grievances regarding his housing status if he actually believed it presented a danger in light of his condition, and they endeavor to argue that the fact that Peet did not file grievances

about this matter prior to being badly injured is somehow dispositive of their own liability.  Additionally, the defendants suggest that they must be protected from any liability because the decision to return Peet to his cell was one made by a nurse who is not even employed by the Department of Corrections.  Finally, the defendants argue that they are entitled to qualified immunity on all of Peet's claims.

The parties have fully briefed the motion, which is now ripe for disposition. For the reasons that follow, the motion will be denied with respect to Peet's deliberate indifference claims, because the record evidence is replete with disputes that are relevant to a determination of whether the corrections officers on duty were deliberately indifferent in their care for Peet, and particularly with respect to their response to the incident.  The record also contains evidence that, taken in the light most favorable to Peet, could support a finding of liability against defendants Palakovich and Zobitne.  We also do not find that the defendants are entitled to qualified immunity on these claims.

In contrast, we find that Peet's claims for due process violations under the state-created danger doctrine are not supported, as there is a lack of evidence that by returning Peet to his cell at the direction of medical, the defendants were affirmatively enhancing a foreseeable risk that Peet would suffer injury.  Instead, the evidence establishes a disputed factual issue relating to Peet's claims that the defendants were

13

deliberately indifferent and failed to act, bur does not show that they affirmatively

acted in a way that enhanced the risk to Peet.

## III.   <u>STANDARD OF REVIEW</u>

Rule 56(a) of the Federal Rules of Civil Procedure provides as follows:

> A party may move for summary judgment, identifying each
> claim or defense – or the part of each claim or defense – on
> which summary judgment is sought.  The court shall grant
> summary judgment if the movant shows that there is no
> genuine dispute as to any material fact and the movant is
> entitled to judgment as a matter of law.  The court should
> state on the record the reasons for granting or denying the
> motion.

Fed. R. Civ. P. 56(a).  For purposes of Rule 56, a fact is material if proof of its

existence of nonexistence might affect the outcome of the suit under the applicable

substantive law.  <u>Haybarger v. Laurence Cnty. Adult Prob. & Parole</u>, 667 F.3d 408,

412 (3d Cir. 2012) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248

(1986)).  For an issue to be genuine, "all that is required is that sufficient evidence

supporting the claimed factual dispute be shown to require a jury or judge to resolve

the parties' differing versions of the truth at trial."  <u>Id.</u> (quoting <u>Anderson</u>, 477 U.S.

at 248-49).

Accordingly, in support of a motion for summary judgment, the moving party

must show that if the evidence of record were reduced to admissible evidence in

court, it would be insufficient to allow the non-moving party to carry its burden of proof.  See Celotex v. Catrett, 477 U.S. 317, 323 (1986).  Provided the moving party has satisfied this burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  Scott v. Harris, 550 U.S. 372, 380 (2007).  Instead, if the moving party has carried its burden, the non-moving party must then respond by identifying specific facts, supported by evidence, which show a genuine issue for trial, and may not rely upon the allegations or denials of its pleadings.  See Martin v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007); see also Fed. R. Civ. P. 56(c).

In adjudicating the motion, the court must view the evidence presented in the light most favorable to the opposing party, Anderson, 477 U.S. at 255, and draw all reasonable inferences in the light most favorable to the non-moving party, Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992). Where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true.  Id.  Additionally, the court is not to decide whether the evidence unquestionably favors one side or the other, or to make credibility determinations, but instead must decide whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.  Id. at 252; see also Big Apple

BMW, 974 F.2d at 1363.   In reaching this determination, the Third Circuit has instructed that:

> To raise a genuine issue of material fact . . . the opponent need not match, item for item, each piece of evidence proffered by the movant.   In practical terms, if the opponent has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent.   It thus remains the province of the factfinder to ascertain the believability and weight of the evidence.

Id.   In contrast, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotation marks omitted); NAACP v. North Hudson Reg'l Fire & Rescue, 665 F.3d 464, 476 (3d Cir. 2011).

## IV.   DISCUSSION

### A.   Deliberate Indifference Under the Eighth Amendment

Peet's claims that the defendants violated his rights under the Eighth Amendment by housing him in unreasonably dangerous conditions in light of his medical circumstances, and by responding in an unreasonably dilatory manner to his

last seizure during which he suffered burning and disfiguring injury.  These claims form the heart of this lawsuit.

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  With respect to prisoner confinement, the Eighth Amendment obligates the government "to provide medical care for those whom it is punishing by incarceration."  Estelle v. Gamble, 429 U.S. 97, 103 (1976); see also Farmer v. Brennan, 511 U.S. 825, 832-33 (1994); Reynolds v. Wagner, 128 F.3d 166, 172-73 (3d Cir. 1997).  "An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met.  In the worst cases, such a failure may actually produce physical torture or a lingering death."  Estelle, 429 U.S. at 103 (quoting In re Kemmler, 136 U.S. 436, 447 (1890)).

In Estelle, the United States Supreme Court held that prison officials violate the Eighth Amendment's proscription of cruel and unusual punishment when they exhibit "deliberate indifference to serious medical needs of prisoners."  429 U.S. at 104.  The standard that Estelle established "requires [both that there be] deliberate indifference on the part of the prison officials and [that] the prisoner's medical needs . . . be serious."  Monmouth County Correctional Inst. Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987) (quoting West v. Keve, 571 F.2d 158, 161 (3d Cir. 1978)).

17

Under this two-prong test, an inmate must first objectively establish a deprivation of medical care, or the result of such deprivation, the result of which was sufficiently serious to implicate a constitutional violation.  Montgomery v. Pinchak, 294 F.3d 492, 499 (3d Cir. 2002) (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)).  An inmate's medical need is serious under this standard when it "has been diagnosed by a physician as requiring treatment or . . . is so obvious that a lay person would easily recognize the necessity for a doctor's attention."   Monmouth County Corr. Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987) (citations and internal quotations omitted).  Secondly, the inmate-plaintiff must show that prison officials subjectively knew of the deprivation and "disregard[ed] an excessive risk to [the] inmate['s] health or safety."  Natale v. Camden County Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003).

Thus, in the medical context, a constitutional violation under the Eighth Amendment occurs only when state officials are deliberately indifferent to an inmate's serious medical needs.  Estelle, 429 U.S. at 105.  To establish a violation of his constitutional right to adequate medical care in accordance with this standard, Peet is thus required to point to evidence that demonstrates (1) a serious medical need, and (2) acts or omissions by prison officials that indicate deliberate indifference to that need.  Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999); see also Woloszyn

v. County of Lawrence, 396 F.3d 314, 321 (3d Cir. 2005) (for a claim of deliberate indifference against a prison official to survive, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). The Third Circuit has found deliberate indifference where a prison official: "(1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." Rouse, 182 F.3d at 197. The Third Circuit has also held that "[n]eedless suffering resulting from the denial of simple medical care, which does not serve any penological purpose, . . . violates the Eighth Amendment." Atkinson v. Taylor, 316 F.3d 257, 266 (3d Cir. 2003).

In summary, deliberate indifference to a serious medical need involves the "unnecessary and wanton infliction of pain." Estelle, 429 U.S. at 104. Such indifference may be evidenced by an intentional refusal to provide care, delayed provision of medical treatment for non-medical reasons, denial of prescribed medical treatment, denial of reasonable requests for treatment that results in suffering or risk of injury, Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993), or "persistent conduct in the face of resultant pain and risk of permanent injury," White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990). The Third Circuit has held that prison officials act with

deliberate indifference when (1) reasonable requests for medical treatment are denied, exposing the inmate to undue suffering or the threat of further injury; (2) necessary medical treatment is delayed for non-medical reasons; (3) arbitrary or burdensome procedures are erected to create treatment delays to suffering prisoners; and (4) inmates are presented from receiving access and treatment from capable medical professionals.  See Lanzaro, 834 F.2d at 346-47.

At the same time, it is also clear that the mere misdiagnosis of a condition or medical need, or negligent treatment provided for a condition, is not actionable as an Eighth Amendment claim because medical malpractice is not a constitutional violation.  See Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004); Singletary v. Pa. Dep't of Corr., 266 F.3d 186, 192 n.2 (3d Cir. 2002) (claims of medical malpractice, absent evidence of a culpable state of mind, do not constitute deliberate indifference under the Eighth Amendment).  Instead, deliberate indifferent represents a much higher standard, one that requires "obduracy and wantonness, which has been likened to conduct that includes recklessness or a conscious disregard of a serious risk." Rouse, 182 F.3d at 197 (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986)).

**B.      There are Disputed Issues of Fact Regarding the Adequacy of the Defendants' Response to and Treatment of Peet's Serious Medical Needs**

The defendants argue that the evidence compels summary judgment in favor of the responding officers and Sergeant Seese, as they contend that there are no facts that could show that they responded in a dilatory manner to Peet's needs after becoming aware of them, or that when they responded their treatment of Peet was deliberately indifferent.  The defendants also press the Court to grant summary judgment in their favor because Peet had been treated by medical professionals at the prison, and thus the defendants suggest that they should be immunized from any responsibility for responding to or monitoring Peet's condition since he had been cleared by medical personnel to be returned to his cell.  We disagree that the evidence warrants summary judgment, as there are numerous facts which, if believed, could support Peet's claims against these defendants.

First, we reject the defendants apparent suggestion that it is somehow Peet's fault that he was housed in a cell with a burning radiator, despite having demonstrated on multiple occasions that he was prone to seizures, and after he had in fact suffered seizures that required outside hospitalization and a trip to prison infirmary – only hours before his second seizure.  The defendants make this argument in an effort to show that nobody can predict when a seizure will occur and, therefore, they can have

21

no liability for returning Peet to his cell in his known condition.  The defendants thus note that "Peet was able to have his medical situation evaluated by medical staff upon his request or file a grievance regarding the radiator in his cell.  Inmate Peet himself knew that he was subject to seizures because he had taken medication for his seizure disorder from 1980 through 2005." (Doc. 83, at 11-12.)  Additionally, the defendants note that "Peet knew that there was a radiator in the cells where he was housed on "A" and "B" blocks, but never told any guards that the radiator was too hot."  (Id.) The defendants even suggest that Peet's claims should somehow be found to be unexhausted because he failed to file a grievance asking to be placed in a different cell.  The defendants cite to no authority that stands for the proposition that it is up to an inmate to ensure his own safety while in custody, and that his failure to file an anticipatory grievance or request a cell transfer to avoid future hazards somehow forecloses his ability to enforce his rights under the Eighth Amendment.  The law is clear that it is defendants who have control over Peet, and, therefore, bear the custodial obligation to ensure that his medical needs are not disregarded.[2]

---

[2]  This argument is further undermined by the fact that Peet suffered his second seizure just hours after suffering a previous seizure that required a trip to the prison infirmary for care, and shortly after Peet had been housed in an outside medical facility where he was being treated for seizure disorder.  The defendants's suggestion that it was Peet who had the responsibility for ensuring his own safety and housing circumstances is not only legally untenable, but it suggests that the defendants – who are constitutionally obliged to provide reasonably for the

Moreover, the record is replete with evidence showing that the defendants and the DOC generally knew that responding to inmate medical needs was a priority, and yet there is also evidence that this priority – which was in fact official DOC policy – was not heeded.  Indeed the DOC policy in effect at the time of the events in this case provided that "Corrections officers and other staff shall be trained in accordance with Department policy 5.1.1, Staff Development and Training, in the following areas:  (1) response to health-related situations, ***within four minutes upon notification/realization of the emergency***." (Doc. 92, Ex. 28, Emergency Response Policy) (emphasis added.)  Superintendent Palakovich acknowledged this policy, and that it applied to all staff members who might come into contact with inmates, including both corrections officers and medical staff.  (Doc. 81, Ex. I, Palakovich Dep. at 122-25.)  Palakovich also testified that the reason for the policy was to ensure that inmates were provided medical care and treatment as quickly as possible, and he testified that emergency response times in excess of four minutes would constitute a violation of DOC policy.

The defendants concede that there is a dispute in the record about how long it took to respond to Inmate Reeve's cries of alarm after Peet's second seizure began

---

inmate's safety and to provide medical care –  bore no obligation for taking into consideration Peet's medical needs and conditions.  We disagree with the defendants' suggestion in this regard, and the law does not support this assertion.

around 10:00 p.m., but argue that this evidence, even taken in the light most favorable to Peet would not support a finding that any of the defendants was deliberately indifferent to Peet's circumstances.  In support of this argument, the defendants urge the Court to embrace the view that Reeve's shouting and screaming for help for a period of time of up to 10 minutes was insufficient to notify corrections staff that there was an actual emergency that required attention.  (Doc. 83, at 15.)  As support for this assertion, the defendants rely exclusively on testimony from Palakovich, who also said that notification does not begin until an officer arrives at the scene of a bona fide emergency and confirms that assistance is needed.  The defendants provide no legal support for the view that the Superintendent of a prison can, through his own testimony, establish when an emergency has occurred, or when staff became notified of that emergency.  Moreover, the defendants' assertions here are entirely divorced from the undisputed facts that the defendants knew that just hours earlier, Inmate Reeves had similarly alerted staff to Peet's first seizure, and Sergeant Seese had testified that he had just seen Peet, and realized that he might need follow-up.  In the context of this case, at minimum, there is a question of fact as to whether Reeves and other inmates on the block who had again caused a crescendo of noise in response to Peet's second seizure put corrections staff on notice that something very serious was underway.

Moreover, Peet has submitted an expert report by Daniel Vazquez, the former

Warden of San Quentin Prison and a correctional consultant with over 36 years of

experience in the field in support of his position that the officers on duty were slow

to respond in this case, and unreasonably so. (Doc. 92, Ex. 29, Vazquez Report.)

Vazquez opined that given the small size and configuration of A-block, officers in the

vicinity could have easily responded within four minutes. Mr. Vazquez stated as

follows in his report:

> Measurements taken of the cell block showed that the
> block was approximately 111 feet in length with cells
> located on 2 separate levels or tiers on either side of the
> block. There was also a common area that separated the
> tiers and cells. The "bubble" or secure command center
> was situated in the middle of "A" block and was located
> approximately 49 feet from Mr. Peet's cell. At the time of
> Mr. Peet's seizure and burn injuries, one officer was
> assigned to the control bubble while the other two officers
> remained posted and roving on the block. Given the short
> distance between the command center and Mr. Peet's cell,
> it is my opinion that Sgt. Seese, the supervisor on duty and
> the other two correctional officers on duty, Officer
> Steinour-Eger and Officer Pierre, could and should have
> easily been able to comply with the 4 minute emergency
> response time limit. In fact, given the relatively small size
> of "A" block, it is difficult to understand how and why
> three correctional officers assigned to monitor and
> supervise inmates took so long to get to Mr. Peet after
> being alerted to his medical emergency by Mr. Reeves.
> Under the circumstances, and given the short distances
> involved, it is not unreasonable to expect and envision an

appropriate response time on the part of the officers on duty that evening to be less than a minute, and perhaps only a few seconds, depending on their proximity to Mr. Peet's cell at the time the cry for help was made.

In my opinion, a 5-10 minute delay by three officers in responding to a medical emergency involving an inmate located on a relatively small block and approximately 49 feet away from the command bubble is completely unacceptable conduct under any objective standard governing emergency response time by any properly trained correctional staff.  It is certainly a violation of DOC policy governing emergency response time by correctional staff.

(Id., at 11; Doc. 92, Ex. 13, Diagram of A-Block.)  Even Superintendent Palakovich agreed that officers should have been capable of responding within four minutes after being notified of an emergency, and that a 5-10 minute delay was "unacceptable," and, had he known about the delayed response, he would have disciplined the officers who were late to respond.  (Doc. 92, Ex. 27, Palakovich Dep. at 130-32, 135-36, 142-46.)

There is thus disputed evidence in the record as to whether Sergeant Seese and the other corrections officers assigned to A-block were slow to respond to the emergency taking place in Peet's cell.

There is also disputed evidence about the adequacy of the officers' response once they reached the cell door.  Peet's cellmate, Allen Reeves, testified that after

arriving at the cell door, officers waited up to an additional five minutes before entering the cell and rendering aid to Peet, who continued to have his face pinned against a scalding radiator.  Indeed, Sergeant Seese testified that when he arrived, he believed he saw Peet vomiting blood and that he could see blood coming from Peet's face.  We agree with the plaintiff's expert, Daniel Vazquez, that if a factfinder found these facts in Peet's favor, it could support a finding of deliberate indifference:

> Further, as Mr. Reeves testified was the case, if another 5 minutes passed before Sgt. Seese, Officer Steinour-Eger and /or Officer Pierre even opened the cell door to render aid to Mr. Peet, who at the time would have been helpless and incapacitated because of the seizure and suffering increasingly severe burn injuries to his face and body as a result of being wedged or pinned against the scalding hot radiator, it is my opinion that such a further delay in accessing the cell and rendering aid to Mr. Peet would be inexcusable and constitute outrageous conduct, particularly given the ability of officers to communicate by hand held radios and since cell gates would be controlled electronically by the correctional staff from the "A" Block Control Bubble.  Upon witnessing Mr. Peet's predicament and need for immediate help, there was no reason for officers on duty to delay another 5 minutes before accessing the cell.  According to Mr. Reeve's testimony, as much as 15 minutes may have passed between the time he notified correctional officers on duty of Mr. Peet's emergency, and the time they actually opened and entered his cell to pull him off a scalding hot radiator.

(Doc. 92, Ex. 29, Vazquez Rep. at 11-12.)   Here, too, Palakovich agreed with

Vazquez that if as much time elapsed as Reeves claims, he would have considered the

delay in entering the cell and rendering aid to be "egregious" and to demonstrate a

lack of concern for the inmate's health.  (Doc. 92, Ex. 27, Palakovich Dep. at 135-36,

139-40.)  Simply put, we believe that viewing the record in the light most favorable

to the plaintiff, a reasonable jury could conclude that Sergeant Seese, and Officers

Pierre and Steinour-Eger showed deliberate indifference to Peet's serious and

manifest medical needs by delaying their response to an emergency that followed

closely on the heels of an earlier seizure and a similar commotion by inmates, and by

delaying their entry into the cell to provide aid even though Peet appeared to them to

be in extreme distress.[3]  The defendants' motion for summary judgment with respect

---

[3] The defendants also suggest that they are entitled to summary judgment
because Peet had been under the care of medical professionals at the prison, and,
therefore, the defendants had no duty to follow up on Peet's condition, or take any
steps to reasonably ensure his care when he was returned to his cell.  The law does
not support the defendants' assertion in this regard, as the majority in Barkes
emphasized "that nonmedical prison officials may 'be chargeable with the Eighth
Amendment scienter requirement of deliberate indifference' when the possess
actual knowledge or have reason to believe that prison medical staff are
mistreating or failing to treat inmates' serious medical conditions." Barkes, 766
F.3d at 329 (quoting Spruill, 372 F.3d at 236). Furthermore, this Eighth
Amendment claim involves a discrete issue that was uniquely with the province of
responding correctional staff, and was not the subject of medical deference. The
question of whether staff acted with deliberate indifference when the left Peet's
head and face wedged against a red-hot radiator for minutes resulting in pain,
scarring and blindness is not a matter of medical opinion, where staff needed to

to Sergeant Seese and Officers Pierre and Steinour-Eger on the plaintiff's Eighth

Amendment claims will be denied.[4]

_____

defer to a doctor's advice.

    [4] The plaintiff has argued that there are additional reasons why summary judgment is unwarranted, including that certain facts in the record suggest that officers and medical staff had received no training in responding to emergencies within the time limits prescribed by DOC policies, and because there were inadequate policies in place to assist prison staff in communicating with one another about inmate-related health issues.  We find it unnecessary to summarize the competing evidence in the record regarding these matters, which the plaintiff has offered in opposition to the defendants' motion for summary judgment, because we find that the disputed facts in the record regarding the defendants' responsiveness to Peet's acute medical needs on its own makes summary judgment unwarranted.  The fact that we do not summarize and discuss these additional matters in this memorandum does not preclude the plaintiff from presenting evidence regarding these other potentially relevant issues at trial.

    We do pause to note, however, that there is evidence to show not only that the officers who were on duty on March 16, 2008, were entirely unaware that Peet had suffered seizures, and there is evidence to show that where the medical staff had important information about a particular inmate who suffered from an acute condition, that information was not even communicated to corrections officers responsible for monitoring the inmate.  (Doc. 92, Ex. 15, Seese Dep. at 38, 79.) Sergeant Seese testified that he had "no use" for that type of information.  (Id., at 79.)  Officer Pierre testified that he was unaware that Peet had been hospitalized just over a week before March 16, and he was even unaware that Peet had suffered a seizure earlier during his shift.  (Doc. 92, Ex. 31, Pierre Dep. at 12, 92.)  Only Officer Steinour-Eger testified that she knew Peet was taking anti-seizure medication because of some time he had spent in the infirmary, but her knowledge apparently was merely fortuitous because she testified that the medical staff "don't let us know [the inmates'] medical condition . . . ."  (Doc. 92, Ex. 32, Steinour-Eger Dep. at 21.)  In addition to evidence showing the medical staff did not communicate this type of information to corrections officers responsible for checking on patients during their shifts, there is evidence showing that even the medical staff on duty on March 16 were unaware of Peet's condition, or that he

### C.     Personal Involvement by Defendants Palakovich and Zobitne

Section 1983 provides a cause of action against "every person who," under color of state law, "subjects or causes to be subjected," another person to a deprivation of a federally protected right.  42 U.S.C. § 1983.  It is and has long been hornbook law that in order to be liable on a claim brought pursuant to 42 U.S.C. § 1983, a defendant must have had personal involvement in the alleged constitutional violation.  Baraka v. McGreevey, 481 F.3d 187, 210 (3d Cir. 2007) ("A defendant in a civil rights action 'must have personal involvement in the alleged wrongs to be liable,' and 'cannot be held responsible for a constitutional violation which he or she neither participated in nor approved.'") (internal citations omitted.)   Personal involvement may be proven not only by showing that the defendant had actual, direct involvement in the violation, but also through proof of personal direction or of actual knowledge and acquiescence in the violation.  Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005); Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1987).  To prove personal involvement through acquiescence requires that a plaintiff demonstrate that the defendant had contemporaneous knowledge of the alleged wrongdoing, and actual

---

had suffered a seizure earlier in the evening.  (Doc. 92, Ex. 21, McKinney Dep. at 77, 83; Ex. 30, Overbaugh Dep. at 77-78.)

supervisory authority over the alleged violator.  Robinson v. Pittsburgh, 120 F.3d 1286, 1293-94 (3d Cir. 1997).

Thus, it is well established that section 1983 liability cannot be predicated upon the application of *respondeat superior*.  Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009); Bistrian v. Levi, 696 F.3d 352, 366 n.5 (3d Cir. 2012); Durmer v. O'Carroll, 991 F.2d 64, 69 n.14 (3d Cir. 1993).  Therefore, in the absence of *respondeat superior* as a basis for liability, a defendant may only be charged with violations arising from his own involvement in the constitutional tort alleged.  Barkes v. First Corr. Med., Inc., 766 F.3d 307, 316 (3d Cir. 2014).

The defendants have seized upon this familiar, bedrock principle of § 1983 litigation, and have asserted that the Court must grant summary judgment in favor of defendants Palakovich and Zobitne because they were not present at the time of Peet's injury, and were not personally involved in rendering aid, or in making the decision to return Peet to his cell, or in the allegedly dilatory and indifferent response to his urgent medical needs.  Recent guidance from the Third Circuit Court of Appeals in this area, however, teaches that the potential liability of these supervisory defendants is not nearly a matter as simple as the defendants suggest.  The Third Circuit has reaffirmed that in cases involving allegations of deliberate indifference to inmate medical need, supervisors may indeed face liability if through their own

failure to train and supervise subordinate staff who were involved in the injuries suffered, provided that there is evidence to show that the supervisors themselves were deliberately indifferent.  We explain further below.

In Ashcroft v. Iqbal, the United States Supreme Court issued a decision that caused many courts to reassess their jurisprudence regarding the availability of supervisory liability in § 1983 litigation.  556 U.S. 662 (2009).  For its part, the Third Circuit for a time declined "to wade into the muddied waters of post-Iqbal 'supervisory liability,'" Bistrian v. Levi, 696 F.3d 352, 366 n.5 (3d Cir. 2012), but in 2014 the Court found occasion to do so in Barkes v. First Correctional Medical, Inc., 766 F.3d 307 (3d Cir. 2014).  In a decision that thoroughly surveyed the treatment of this issue by other circuits post-Iqbal, and carefully assessed the effect of Iqbal on the Third Circuit's own precedent in the area, the Court found that supervisory liability survived Iqbal, and that the Court's precedent in Sample v. Diecks, 885 F.2d 1099 (3d Cir. 1989) setting forth the necessary elements that must be proven to establish supervisory liability remained good law.  However, the court's decision was nuanced, and focused specifically on claims of supervisory liability arising out of an instance of alleged deliberate indifference to an inmate's serious medical needs – precisely the issue presented in the instant litigation.

32

This aspect of the Third Circuit's decision in <u>Barkes</u> is important, as one of the central holdings in that case is that "because the state of mind necessary to establish a § 1983 or <u>Bivens</u> claim varies with the constitutional provision at issue, so too does the state of mind necessary to trigger liability in a supervisory capacity."  766 F.3d at 318.  Accordingly, blanket assertions that summary judgment is warranted in these cases by mere reference to familiar cases holding that supervisors must have "personal involvement" in the underlying tortious conduct alleged are insufficient, because the kind of personal involvement necessary to support a supervisory liability claim depends on the claim asserted.  <u>Id.</u> at 319 ("the mental state required to impose supervisory liability will vary with the underlying tort.").  Agreeing with several courts that had reached that conclusion, the Third Circuit stated as follows, speaking specifically about the legal standard applied in Eighth Amendment claims of deliberate indifference:

> We do not read <u>Iqbal</u> to have abolished supervisory liability in its entirety.  Rather, we agree with those courts that have held that, under <u>Iqbal</u>, the level of intent necessary to establish supervisory liability will vary with the underlying constitutional tort alleged.  In this case, the underlying tort is the denial of adequate medical care in violation of the Eight Amendment's prohibition on cruel and unusual punishment, and the accompanying mental state is subjective deliberate indifference.

Id.[5]   Indeed, the court of appeals expressly found that supervisory liability in the

context of a deliberate indifference claim flows directly from the nature of the tort,

and is consonant with the teaching of Iqbal:

---

[5]   This subtle but key point from Barkes is critical in § 1983 litigation, because different constitutional torts have different mental states that are required in order for liability to be imposed.  For example, the Third Circuit found that in cases alleging excessive force by an officer, the law requires a plaintiff to show deliberate action on the part of a defendant.  Id. at 321.  For that reason, it is not enough to assert supervisory liability against an official based an omission or a failure to act, since deliberate action is a critical element of th claim.  Id. Likewise, in Iqbal, the Supreme Court noted that "purpose rather than knowledge is required to impose Bivens liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her supervisory responsibilities."  556 U.S. at 678.  The Third Circuit has read this language to mean that "the [Supreme] Court expressly tied the level of intent necessary for superintendent liability to the underlying constitutional tort."  Barkes, 766 F.3d at 318.  As the Barkes majority noted, other circuits have carefully drawn distinctions between the mental state required for particular torts when determining whether supervisory liability will lie.  For example, in T.E. v. Grindle, the Seventh Circuit recognized that Iqbal had abrogated its precedent that permitted plaintiffs to recover from supervisors who were deliberately indifferent toward a subordinate's purposeful discrimination, "because in a discrimination claim Iqbal requires that 'a plaintiff must show that the supervisor possessed . . . discriminatory intent."  Barkes, 766 F.3d at 319 (quoting T.E. v. Grindle, 599 F.3d 583, 585-87 (7th Cir. 2010)).  In contrast, the Seventh Circuit found that a plaintiff's substantive due process claim could continue against a supervisor, for which the court held that "[w]hen a state actor's deliberate indifference deprives someone of his or her protected liberty interest . . ., that actor violates the Constitution, regardless of whether the actor is a supervisor or subordinate."  Id. Accordingly, as the Third Circuit summed up its overview of the circuit decisions post-Iqbal, "the mental state necessary for supervisory liability tracks with the mental state required for the underlying tort."  Id. at 319.

> Iqbal held that state officials are liable only for their own unconstitutional actions. The essence of the type of claim we approved in Sample is that a state official, by virtue of his or her own deliberate indifference to known deficiencies in a government policy or procedure, has allowed to develop an environment in which there is an unreasonable risk that a constitutional injury will occur, and that such an injury does occur. Liability in such a situation is, as Iqbal requires, imposed not vicariously but based on the supervisor's own misconduct, because to exhibit deliberate indifference to such a situation is a culpable mental state under the Eighth Amendment.

Id. at 320 (original emphasis); see also Starrr v. Baca, 652 F.3d 1202, 1207 (9th Cir. 2011) ("[W]hen a supervisor is found liable based on deliberate indifference, the supervisor is being held liable for his or her own culpable action or inaction, not held vicariously liable for the culpable action or inaction of his or her subordinates.").[6]

In its analysis, the court reaffirmed its prior holding in Sample in which the court enunciated a four-part test to be applied when determining whether an official may be held liable on a claim that he or she failed to supervise, train or supervise subordinates. The court first found that supervision is defined broadly in this context to "entail[], among other things, training, defining expected performance by

---

[6] The Third Circuit underscored its point that supervisory liability claims must be considered based upon the nature of the constitutional tort alleged when it cautioned that it would "leave for another day the question of whether an under what circumstances a claim for supervisory liability derived from a violation of a different constitutional provision remains valid." Id. at 320.

promulgating rules or otherwise, monitoring adherence to performance standard, and responding to unacceptable performance whether through individualized discipline or further rulemaking."  885 F.2d 1099, 1116 (3d Cir. 1989).  With supervision thus being defined broadly, the Court's four-part test provides that a plaintiff must

> identify a supervisory policy or practice that the supervisor failed to employ, and then prove that:  (1) the policy or procedures in effect at the time of the alleged injury created an unreasonable risk of a constitutional violation; (2) the defendant-official was aware that the policy created an unreasonable risk; (3) the defendant was indifferent to that risk; and (4) the constitutional injury was caused by the failure to implement the supervisory practice or procedure.

Id. at 1118; see also Beers-Capitol v. Whetzel, 256 F.3d 120, 135 (3d Cir. 2001) ("Sample's four-part test provides the analytical structure . . ., it being simply the deliberate indifference test applied to the specific situation of a policymaker.").  In Barkes, the court confirmed that this test remains the appropriate analytical framework for these claims following Iqbal.  766 F.3d at 330.

Mindful of the Third Circuit's recent guidance in this field of supervisory liability claims for deliberate indifference to an inmate's serious medical needs, we turn to the defendants' argument that defendants Palakovich and Zobitne are entitled to summary judgment in their favor because they assertedly had no personal involvement in the alleged constitutional violations.

36

The defendants argue that Palakovich had absolutely no personal involvement in the incidents that gave rise to this lawsuit, but was instead the Superintendent of SCI-Camp Hill for two and a half years, from December 2007 until April 2010, when he retired. Despite being the Superintendent, the defendants suggest that Palakovich had little role in many aspects of SCI-Camp Hill's operations, and no involvement in any matter relevant to Peet's claims. In support of these assertions regarding Palakovich's asserted lack of personal involvement, the defendants rely exclusively on Palakovich's own deposition testimony. (Doc, 81, Ex. I.)

During his tenure, Palakovich maintained responsibility for inmate grievances, public information, litigation coordination, and other administrative tasks related to the operation of the prison. (Id., at 32, 33.) The defendants place great reliance on the apparently undisputed fact that there is no evidence to show that Palakovich had any interaction with Peet aside from learning about the incident wherein Peet suffered burns. (Id., at 110.) Palakovich also testified that he processed an extraordinary occurrence report relating to the matter, but otherwise had no direct involvement in or connection to the incident. (Id., at 82.) Then the defendants also argue that despite being the Superintendent with overall responsibility for the prison, Palakovich nonetheless had no authority to dictate medical treatment of inmates, and that any decision about what to do with an inmate with seizure disorder is a matter committed

37

entirely to the discretion of medical personnel.  (Id., at 64, 69.)  Likewise, the

defendants note evidence that Palakovich was not personally involved in decisions

about whether inmates needed outside medical care, or even in the day-to-day celling

decisions for particular inmates.  (Id., at 104-05.)

The defendants acknowledge that Palakovich, as Superintendent, had a role to

play in terms of disciplining staff, but argue he had no "direct responsibility" for

training any of the corrections officers or medical staff.  (Id., at 45, 88, 154.)  The

defendants further minimize Palakovich's scope of authority by noting that prison

policies and procedures are promulgated by the DOC Central Office, and not by

officials at SCI-Camp Hill.  (Id., at 38-39.)  The defendants maintain that Palakovich

was not involved in creating these procedures, (id., at 41), or in creating any of the

ACA Accreditation Standards that serve as a model used by the DOC, (id., at 35).

Based upon these assertions alone, the defendants insist that "Peet cannot point to any

action by Palakovich to show he had any involvement in the staff's response to his

seizure." (Doc. 83, at 7.)

As an initial matter, the deposition testimony cited is a mere fraction of all that

Palakovich testified to, and other testimony makes clear that while Palakovich may

not have had the authority to dictate a medical course of treatment, he acknowledged

that "their operations, their supervision, their conduct within the prison was governed

by [him], ultimately, as the superintendent of the facility." (Id., at 64.)   More importantly, the defendants' exclusive focus on Palakovich's asserted inability to make medical decisions and his lack of direct interaction with Peet misses the salient focus that the Third Circuit highlighted in Barkes, which is on whether Palakovich's own conduct in his role as a supervisor was itself deliberately indifferent with respect to policies and procedures within the prison.

As noted, in a case involving claims of deliberate indifference, the plaintiff must show that (1) the policy or procedures in effect at the time of the alleged injury created an unreasonable risk of a constitutional violation; (2) the defendant-official was aware that the policy created an unreasonable risk; (3) the defendant was indifferent to that risk; and (4) the constitutional injury was caused by the failure to implement the supervisory practice or procedure.  Sample, 885 F3d. at 1118.  The plaintiff has highlighted numerous places in the record that could support his claim that Palakovich was deliberately indifferent by failing to ensure that correctional officers within the chain of command at the prison received proper training and instruction, particularly with respect to response times in emergency situations, and the provision of emergency medical treatment to inmates.  (Doc. 81, Ex. I, at 44.)  In particular, Peet notes that official policy dictated that emergency response times were to be within four minutes, something that Palakovich himself acknowledged was

expected of staff.  Nevertheless, there is evidence in the record to show that SCI-Camp Hill officers on duty on the day of the alleged incident had never been trained in effective response times, and indeed were entirely unaware of the 4-minute maximum response time expected until they learned of it during discovery in this case.  (Doc. 92, Ex. 31, Pierre Dep., at 5, 9, 51.)  Likewise, DOC nurses who were also under Palakovich's supervision and ultimate authority were also never trained regarding expected response times.  (Doc. 92, Ex. 21, McKinney Dep. at 28-29.)  Moreover, other evidence also indicates that Palakovich would have disciplined subordinate staff if he were to have learned that they failed to respond timely to an emergent situation involving an inmate because such a failure would be tantamount to exhibiting "a disregard for those medical needs" and a "lack of concern" for the inmate's well-being.  (Doc. 81, Ex. I, Palakovich Dep. at 135-136, 147.)

Thus the evidence reveals a potentially stark contrast between what defendant Palakovich describes as his understanding of the medical emergency response policy, a policy he was charged with implementing, and the general lack of awareness of that policy among those who were charged with Peet's safety during the critical moments when he lay disabled with his face wedged against a scalding radiator.  This gulf could have been bridged by essential training, understanding, awareness and communication, but the factual record is largely silent on this score, leaving the gulf

40

between the superintendent's expectations, and staff awareness of those expectations unbridged.

Given these unresolved factual questions, we believe that summary judgment would not be appropriate on a supervisory failure-to-train claim.  We recognize that "[e]stablishing . . .  liability on a failure to train claim under § 1983 is difficult." Reitz v. Cnty. of Bucks, 125 F.3d 139, 145 (3d Cir. 1997).[7]  "Generally, deficient training can only amount to the requisite deliberate indifference 'where the failure to train has caused a pattern of violations.'  Berg v. County of Allegheny, 219 F.3d 261, 276 (3d Cir.2000).  However, an exception exists and a 'failure to train' . . . claim may proceed absent a pattern of violations only where (1) 'a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools [or skills] to handle recurrent situations,' and (2) the likelihood of recurrence and predictability of the violation of a citizen's rights 'could justify a finding that [the] policymakers' decision not to train an officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice—namely, a violation of a specific constitutional or statutory right.'  Kline, 255 Fed.Appx. at 629 (quoting Board of County Commissioners of Bryan County v.

---

[7]These cases deal with failure-to-train claims in a Monell setting but are, in our view, equally applicable to supervisory failure-to-train liability.

Brown, 520 U.S. 397, 409, 117 S.Ct. 1382, 1391 137 L.Ed.2d 626, 642 (1997)).”
White v. Brommer, 747 F. Supp. 2d 447, 463 (E.D. Pa. 2010).

While this is undeniably an exacting standard of proof, here the evidence, albeit disputed, when viewed in a light most favorable to the plaintiff would permit a finding of supervisory failure-to-train liability.  The nature of this policy, which deals with emergency medical responses, underscores the gravity of adequate staff knowledge and training.  The consequences which can be expected flow from a failure to train on the proper response to a medical emergency are also highly predictable, and include death, severe injury, maiming, scarring and intense pain and suffering, matters which can rise to the level of constitutional violations.  Defendant Palakovich’s assertion that he knew of the policy and would have punished those who failed to comply with the policy affirm his subjective understanding of the importance of compliance with these procedures.  Thus, we have a situation where it can arguably be asserted that “(1) ‘a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools [or skills] to handle recurrent situations,’ and (2) the likelihood of recurrence and predictability of the violation of a citizen's rights ‘could justify a finding that [the] policymakers' decision not to train an officer reflected “deliberate indifference” to the obvious consequence of the policymakers' choice—namely, a violation of a specific

constitutional or statutory right.' " <u>White v. Brommer</u>, 747 F. Supp. 2d 447, 463 (E.D. Pa. 2010). Yet, the evidence, and particularly the staff assertions that they were totally unaware of a policy that called for a four minute response to a medical emergency in which it is alleged that an inmate was being blinded, scarred and burned by a radiator for an extended period of time, permits an inference that there was a failure-to-train in this case that rose to a matter of potentially constitutional dimensions.

Thus, while it may be true that Palakovich did not personally make decisions about where to house Peet, or about when he should be released from medical and returned to his cell, or even about when and how to train officers, there is evidence showing that (1) he ultimately was responsible for the prison's operation, (2) he was responsible for ensuring that corrections staff were trained effectively to address emergency situations appropriately, and (3) staff was untrained in responding to emergencies, even though Palakovich apparently had an expectation that staff would respond effectively to inmate emergencies and could face discipline if they did not do so in accordance with DOC policy.

The defendants' suggestion that medical staff are entirely independent of Palakovich, or somehow that they and their decisions fell outside the ambit of his authority, is not legally tenable, and does not provide a basis for summary judgment

43

in light of <u>Barkes</u>.  The Third Circuit was confronted by very similar assertions in

<u>Barkes</u>, and rejected them decisively.  In that case, the defendants had argued that

they were entitled to qualified immunity because "it was not clearly established that

they, as non-medical prison administrators, had a constitutional supervisory duty over

the medical staff."  766 F.3d at 327.  The defendants had relied upon <u>Spruill</u>, supra,

for this proposition, but the Third Circuit highlighted other language in that decision

that substantially narrowed its scope depending on the facts alleged, noting that

corrections staff are only insulated from liability if there is no other countervailing

evidence or reason to believe that there were inadequacies in medical care.  The court

specifically observed that dismissal of claims against non-medical personnel was

appropriate in <u>Spruill</u> because "the plaintiff had failed to plead facts suggesting that

the official was aware of the alleged inadequacies in medical care, not because prison

administrators are categorically exempt from a supervisory role over medical

personnel." <u>Id.</u> (citing <u>Spruill v. Gillis</u>, 372 F.3d 218, 236-37 & n.12).  In <u>Barkes</u>, the

court found that there was a dispute in the record over whether prison administrators

failed effectively to supervise the prison's contract medical providers, who

themselves were alleged to have had insufficient suicide-prevention policies, and

whether those combined shortcomings created an unreasonable risk of Eighth

Amendment violations.  <u>Id.</u>  The record in the instant case is similarly in conflict, and

the plaintiff has done an adequate job of identifying facts that could show that SCI-Camp Hill administrators, including Superintendent Palakovich, were indifferent to their role as supervisors overseeing both corrections staff and medical staff at the prison, and that this indifference – in the face of Peet's serious and documented medical needs – arose to the level of constitutional misconduct.

The result is the same with Zobitne.  Zobitne was the Unit Manager of A-block in March 2008.  As part of her duties, Zobitne was in charge of and supervised housing units, and in this role was responsible for overseeing on-duty officers, sergeants, and inmates within the unit.  (Doc. 92, Ex. 34, Deposition of Renee Zobitne, at 7.)  The plaintiff has pointed to evidence to show that in spite of being responsible over officers and inmates in the unit, Zobitne knew almost nothing about Peet, even after he had been taken out of the prison for acute medical treatment, and after he returned to prison.  Indeed, Ms. Zobitne testified that she "didn't know any of [Peet's] medical issues . . . I just knew he walked a little funny on the side of his foot . . . He was fairly recognizable on the block . . . That's pretty much all I knew of him." (Id., at 16.)  Ms. Zobitne acknowledged that she did not know that Peet had been taken to Holy Spirit on March 7, 2008, or that he had been taken to the dispensary for observation in the evening on March 16, 2008, the same night he suffered his fateful injury.  (Id.)  It is true that Zobtine was not working during the

shift that Peet suffered his second seizure, and the defendants place great weight on this point in their argument that she had no personal involvement in the incident. But Peet is arguing not that Zobitne was involved in the actual response to his emergency, but instead that she was deliberately ignorant of the medical conditions and needs of the inmates housed in her unit, over which she had responsibility.

Peet again relies on the expert report of Daniel Vazquez, the former Warden of San Quentin Prison, in support of his claims that Zobitne's lack of knowledge regarding the inmates on her unit, and her failure to obtain medical information about those inmates, particularly acute cases like Peet, could be tantamount to deliberate indifference:

> In my opinion, as part of her unit management responsibilities, Ms. Zobitne should have had much more knowledge of any inmate with medical needs or existing conditions necessitating specialized supervision and coordinated the communication of such information between the medical and correctional staff. It seems incomprehensible that the unit manager of "A" Block would be so uninformed about major events occurring on her block and have no memory or information about an inmate taken to an outside hospital after having suffered a seizure or that she would receive information regarding Mr. Peet's seizure and burn injuries as a result of "talk on the block." In Mr. Peet's case, it was her responsibility and duty as a supervisor and manager of inmates to know that Mr. Peet had been diagnosed with seizure disorder and that he had been hospitalized at an outside facility on March 7, 2008 and to coordinate and communicate an appropriate

> plan for heightened supervision.  It was also Ms. Zobitne's
> job to manage the officers assigned to the block in such a
> manner that accounted for inmate safety.  Had she been
> knowledgeable about Mr. Peet's prior medical history and
> seizure disorder, Ms. Zobitne could have re-assigned Mr.
> Peet to a cell closer to the command bubble, or to a lower
> bunk in a housing unit that did not have a steam generated
> radiator heating.

(Doc. 92, Ex. 29, Vazquez Rep. at 24.)  Indeed, the defendants do acknowledge that

Ms. Zobitne was empowered to recommend a change to an inmate's housing

assignment if his medical condition suggested it was either necessary or beneficial,

but they maintain that she cannot be liable in this case because she remained ignorant

of Peet's conditions.  This is how the defendants insist that Ms. Zobitne was not

personally involved:  because she remained unaware of Peet's condition – even

though it was serious and known – and because she, therefore, took no action of any

kind, she could have no personal involvement in this incident.  As discussed above,

after Barkes, we do not believe that the defendants have demonstrated that Ms.

Zobitne had no personal involvement; instead, they have highlighted evidence that

could show she was deliberately indifferent to Peet's circumstances and the danger

that was presented by his housing circumstances coupled with his unstable medical

circumstances.  That does not immunize Zobitne from the claims in this case.

Although the defendants place great weight on their contention that the corrections officers and non-medical staff do not have access to inmate medical information, this contention seems both inaccurate and also problematic, both from the perspective of inmate well-being and this litigation.  Zobitne herself testified that Unit Managers can access inmate medical charts and other information, and can pull medical status summaries in order to assist in making appropriate housing determinations for inmates.  Thus, the defendants argue that Ms. Zobitne should be dismissed because she did nothing to learn anything about Peet's medical conditions, which were serious enough to require a stay at an outside hospital and to require follow up on a known seizure disorder, and because she did nothing with respect to altering his housing.  This lack of inquiry, knowledge or action on the part of a unit manager does not, on this record, warrant summary judgment for lack of personal involvement, and it may be probative of deliberate indifference on Zobitne's part.

Furthermore, there is also evidence that could show that Zobitne believed that staff would have been unable to monitor Peet's condition more closely in any event, because the unit had more than 200 inmates, and rounds on the unit were conducted once every 30 minutes, since it would have been "impractical" to do anything more. (Id., at 53.)  Once again, Vazquez offered his opinion that concerns about potential

staffing shortages should not be allowed to trump the constitutional requirement that

inmate medical needs be taken into account:

> In light of her supervisory role over the officers assigned to "A" block, it is also my opinion that she had the authority to require correctional officers to provide specialized or more frequent level of supervision of Mr. Peet to ensure his safety, but simply refused to exercise it because of perceived staffing issues.

(Doc. 92, Ex. 29, Vazquez Rep. at 24.)

Considering the evidence that Peet's condition was serious and that Zobitne

could have but did not take any steps to learn about Peet's medical circumstances

despite those circumstances having only recently required his outside hospitalization,

and the evidence that Zobitne could have but declined to learn about Peet's condition

or to use his medical information in order to arrange for arguably more appropriate

housing or to provide greater supervision of this inmate, we do not find that summary

judgment is warranted simply because Zobitne did not have a direct hand in

responding to or caring for Peet after he suffered his second seizure. We read Barkes

to require that summary judgment be denied based on the evidence and expert

opinions discussed above, since that evidence is probative as to whether Zobitne's

ignorance of Peet's condition, and her failure to do anything to follow up on and even

learn about his condition, was deliberately indifferent.

In sum, there is disputed evidence in the record that makes summary judgment inappropriate for either defendants Palakovich or Zobitne, and the motion for summary judgment on Peet's Eighth Amendment claims will be denied with respect to these defendants as well.

### D.   Qualified Immunity

The defendants argue that even if they are not entitled to summary judgment on the merits of Peet's Eighth Amendment claims, they should nevertheless be granted qualified immunity from the claims.  We disagree that qualified immunity is available on the current record.

The doctrine of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The doctrine protects public officials "from undue interference with their duties and from potentially disabling threats of liability." Wright v. City of Philadelphia, 409 F.3d 595, 599 (3d Cir. 2005). In accordance with this doctrine, government officials will be immune from suit in their individual capacities unless, "taken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right" and "the right was clearly established" at the time of the

objectionable conduct.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  Courts may exercise their discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in consideration of the circumstances presented by the particular case at hand.  Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808, 818 (2009).

"The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Saucier, 533 U.S. at 202.  This inquiry "must be undertaken in light of the specific context of the case."  Id. at 201. Accordingly, "to decide whether a right was clearly established, a court must consider the state of the existing law at the time of the alleged violation and the circumstances confronting the officer to determine whether a reasonable state actor could have believed his conduct was lawful."  Kelly v. Borough of Carlisle, 622 F.3d 248, 253 (3d Cir. 2010).

The defendants' argument that they are entitled to qualified immunity is little more than a rehash of their arguments on the substantive merits of Peet's claims. There is no question that at the time of the injuries in this case, and the events that form the basis of the plaintiff's claims, it was well established that prison officials were obligated to provide inmates in their care and custody with appropriate medical

51

care, and to avoid being deliberately indifferent to their serious medical needs. Estelle v. Gamble, 429 U.S. 97 (1976).   Likewise, it was established that a correctional officer who delays providing medical care may violate the Eighth Amendment.  Rouse v. Plantier, 182 F.3d 192 (3d Cir. 1999).  The Third Circuit last year emphasized that prison officials may be charged with deliberate indifference if they have actual knowledge or have reason to believe that prison medical staff are failing to treat inmates' serious medical conditions.  Barkes, 766 F.3d at 329; see also id. at 328 (noting that prison administrators are "under an obligation to take reasonable measures to guarantee the safety of inmates themselves.") (quoting Hudson v. v. Palmer, 468 U.S. 517, 526 (1984)).

The defendants do not dispute that the law in this field was well-established in March 2008; they simply argue that there is no evidence to show that they violated that well-established right.  We have found that there exist disputed issues of fact on precisely that question, and summary judgment is thus not warranted on grounds that the defendants are entitled to qualified immunity on Peet's Eighth Amendment claims.

## E.    State-Created Danger

Peet also argues that the same conduct of the defendants that forms the basis for his deliberate indifference claims also supports a claim for a substantive due

process violations under a "state created danger" theory of liability. Although this is a somewhat close issue, we do not find that the evidence supports the plaintiff's claims here.

"A state actor generally owes no duty to protect an individual against violence from a third person." Bright v. Westmoreland County, 380 F.3d 729, 736 (3d Cir. 2004). Accordingly, although the Due Process Clause of the Fourteenth Amendment forbids states from depriving "any person of life, liberty, or property, without due process of law," U.S. Const. amend. XIV, § 1, it imposes no converse obligation that the government aid or protect its citizens. Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 255 (3d Cir. 2007) (citing DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 196 (1989)). As the Supreme Court explained in DeShaney, the protections afforded by the Fourteenth Amendment "cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means," in particular through the actions of private parties. DeShaney, 489 U.S. at 195.

However, although a state "does not become the permanent guarantor of an individual's safety by having once offered him shelter," id. at 189, the state may violate the constitution where its actions are "affirmatively employed in a manner that injures a citizen or renders him 'more vulnerable to injury from another source than

he or she would have been in the absence of state intervention.'" Bright, 443 F.3d at 281 (citing Schieber v. City of Phila., 320 F.3d 409, 416 (3d Cir. 2003)).  This is what is commonly referred to as the "state-created danger" doctrine, which provides that although a state has no constitutional obligation to help its citizens, it may be liable for its "affirmative acts which work to plaintiffs' detriment in terms of exposure to danger." D.R. v. Middle Bucks Area Vocational Tech. Sch., 972 F.2d 1364, 1374 (3d Cir. 1992).

In order to make out a claim under the state created danger doctrine, a plaintiff must demonstrate the following four elements:  (1) the harm ultimately caused was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and the plaintiff existed such that "the plaintiff was a foreseeable victim of the defendant's acts," or a "member of a discrete class of persons subjected to the potential harm brought about by the state's actions," as opposed to a member of the public in general; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.  Bright, 443 F.3d at 281.  This final requirement is critical in cases involving claims based upon a state created danger theory:  "[l]iability . . . [must be] predicated upon the states' ***affirmative acts*** which work to the plaintiff's detriment

in terms of exposure to danger.  It is the ***misuse of state authority***, ***rather than a***

***failure to use it***, that can violate the Due Process Clause." Barkes, 766 F.3d at 321

(quoting Phillips v. Cnty of Allegheny, 515 F.3d 224, 235 (3d Cir. 2008) (original

emphasis).

Upon consideration of the five remaining defendants and the scope of their

alleged involvement in the incidents that led to Peet's severe burn injuries; and

mindful of the four-part test that must be satisfied for a claim to lie, we find that

Peet's claims for substantive due process violations fail.  These particular claims are

predicated entirely on the failure of the defendants to supervise Peet adequately in

light of his serious medical condition at the time, as well as the defendants decision

to return Peet to his cell after he was released from the dispensary following the first

seizure he suffered on March 16.  This fact substantially undermines Peet's

contention that the specific injuries in this case were fairly foreseeable.  That decision

to return Peet to his cell was apparently made simply because medical personnel, who

are not parties in this case, determined that Peet was in sufficient shape to be returned

to his cell where, it must be noted, he had never suffered injuries like he did following

his second seizure on March 16.  Although we find that there are disputed issues of

fact with respect to whether the defendants were deliberately indifferent to Peet's

serious medical needs, and whether the responded appropriately to those needs and

Peet's medical emergency, we do not find that there is sufficient evidence that the remaining defendants undertook affirmative acts that placed Peet at enhanced risk of suffering the injuries that he later suffered, and that those injuries were foreseeable and fairly direct. The absence of sufficient evidence to show affirmative conduct on the part of the remaining defendants effectively forecloses Peet's claims here.

## V.   **CONCLUSION**

In the end, this is an action involving a tragic set of circumstances involving an inmate with a cascading array of health problems, chief among them a seizure disorder that in March 2008 was unstable. Those circumstances led to the plaintiff suffering an extraordinary set of injuries, and lifelong disfigurement, and led to the filing of this litigation. Following discovery, we find that the evidence that has been adduced could support the plaintiff's claims that the remaining defendants were deliberately indifferent to his serious medical needs on March 16, 2008, and that their response to his serious medical condition was dilatory and inadequate. That same evidence, however, falls short of demonstrating that the same defendants affirmatively put in motion the events that ultimately resulted in the plaintiff's second seizure, and the injuries that sadly ensued, or that they took affirmative action to increase the risk of its occurrence. Accordingly, the defendants' motion for summary judgment will be denied with respect to the plaintiff's Eighth Amendment claims, and

granted with respect to his claims that the defendants violated his substantive due

process.

An appropriate order consistent with this memorandum shall issue separately.