**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LAWRENCE PEET,** | : | **Civil No. 3:10-CV-482** |
| | : | |
| **Plaintiff** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **v.** | : | |
| | : | |
| **JEFFREY A. BEARD, et al.,** | : | |
| | : | |
| **Defendants** | : | |

**<u>MEMORANDUM OPINION</u>**

## I.   <u>INTRODUCTION</u>

The Prison Litigation Reform Act, 42 U.S.C. § 1997 ("PLRA") requires that prisoners present their claims through an administrative grievance process prior to seeking redress in federal court.  Specifically, the Act provides that: "No action shall be brought with respect to prison conditions under [§ 1983], or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). In this prisoner civil rights case the parties present us with a legal Hobson's choice regarding the application of the PLRA's exhaustion requirement. On one hand, the plaintiff asks us to excuse his failure to exhaust prison grievances, and find that the grievance process was unavailable to him, even though it is entirely undisputed that Peet never attempted to lodge any grievance relating to the injuries he suffered. On the other

hand, the defendants ask that we dismiss this case based upon Peet's acknowledged and total failure to pursue prison grievances, even though the defendants took no steps to assert this potentially dispositive issue for the past five years of this litigation, beyond listing the failure to exhaust as an affirmative defense in their answer to Peet's complaint. Thus, while Peet asks us to excuse his complete failure to exhaust his administrative remedies, the defendants urge us to excuse a five year failure to assert this defense, once the defendants had properly raised this issue in their answer to Peet's complaint.

Now pending in this action is a motion filed by the defendants, styled as a "motion for bifurcation," which is in reality a motion that seeks a defense judgment on the grounds that the plaintiff failed to exhaust, or even attempt to exhaust, his administrative remedies at any time prior to bringing this action. (Doc. 110.) Despite the defendants having waited more than five years to advance this issue after first raising this defense in an answer filed in June 2010, and despite the defendants having declined to raise this as an issue in their timely motion for summary judgment filed in September 2014, we find that the current case law compels a finding that the defendants have not waived this affirmative defense under the PLRA. Having reached that conclusion, we are further constrained to find that the undisputed facts compel a finding that the plaintiff did not exhaust his administrative remedies prior to filing

suit, and therefore the defendants are entitled to judgment in their favor, and to have

Peet's claims against them dismissed, thus obviating the need for trial.

## II.   <u>BACKGROUND AND STATEMENT OF THE CASE</u>

On March 16, 2008, at around 10:00 p.m., Lawrence Peet, an inmate in the

custody of the Pennsylvania Department of Corrections previously housed at the State

Correctional Institution at Camp Hill, suffered the second of two seizures that day

while he was lying on his bunk, which was situated next to a scalding hot radiator.

After his second seizure of the day, Peet collapsed out of his bed and became trapped

against the radiator, with his face in direct contact with the burning surface.  The

record indicates that a frantic scene then ensued within the cell and on the cell block,

with Peet's cellmate screaming for help and other inmates causing a commotion.

Nevertheless, according to some evidence in the record, the response to the emergency

was slow, and it took anywhere from five to ten minutes before corrections officers

arrived at the cell door.  Meanwhile, Peet was convulsing, spitting up blood, all the

while with his face pinned against the radiator for as long as 15 minutes before

corrections officers entered the cell and provided aid. Although the parties dispute

whether corrections officers responded adequately under the circumstances, what is

not disputed is that by the time correctional officers arrived, Peet's face had been in

direct contact with the radiator for several minutes, and the results were ghastly: Peet

suffered extreme burns, facial disfigurement, and permanent blindness in his right eye. He required extensive hospitalization in a burn unit and had multiple surgeries, including skin grafts.

Peet commenced this civil action on March 3, 2010, asserting claims against more than 50 DOC officials and employees. Peet alleged that the defendants violated his constitutional rights through their deliberate indifference to his epileptic condition, in violation of the Eighth Amendment to the United States Constitution, and that their indifference resulted in Peet suffering his second seizure unsupervised in a cell, and resulted in Peet sustaining severe injury. Peet also alleged that the defendants violated his due process rights under a "state created danger" theory of liability, asserting that the defendants affirmatively acted in a manner that exposed to Peet a foreseeable and increased risk of serious harm that later ensued.

The Commonwealth defendants answered the complaint on June 24, 2010. Tucked within the Commonwealth defendants' answer were a number of affirmative defenses, including the defense that "Plaintiff failed to exhaust his administrative remedies by failing to file any grievances concerning the conditions in which he was incarcerated. Therefore, any claim that Plaintiff may have is barred by his failure to exhaust his administrative remedies prior to the filing this action." (Doc. 23, Answer, ¶ 125.) For more than five years after raising this affirmative defense, the defendants

4

never again raised the issue or filed a dispositive motion to address the merits of the affirmative defense.  It was, as a practical matter, forgotten.

The parties subsequently engaged in extensive discovery and pre-trial litigation over a lengthy period of time.  Following this process, and the exchange of expert reports, Peet agreed to dismiss all but five of the original defendants, whom he determined had direct involvement in the constitutional deprivations alleged.  Following this stipulated dismissal, Peet continues to assert his claims against the former Superintendent of SCI-Camp Hill, John Palakovich; Unit Manager Renee Zobitne; Sergeant Scott Seese; and Corrections Officers David Pierre and Manda Steinour-Eger (collectively, the "defendants").  Peet seeks to hold Palakovich and Zobitne liable for the alleged constitutional violations based upon their asserted failures as supervisors, and their own deliberate indifference to policies and procedures that exacerbated his risk of injury.  Peet's claims against the remaining three defendants are based on his allegation that they were indifferent to the risk of harm that Peet faced by returning to his prison cell that contained a hot radiator after suffering a serious seizure; and that they responded in a dilatory and indifferent manner after Peet suffered the seizure that resulted in his severe injuries. As part of the substantial amount of discovery taken in this case, and the myriad factual issues presented by both sides, Peet retained the services of at least one expert, a former

warden of a major state penitentiary, who issued a report critical of the way in which

Peet's medical condition was monitored, and about the response to the emergencies

that Peet presented after suffering multiple grand mal seizures in a cell containing a

scalding hot radiator.  (Doc. 92, Ex. 29.)

The remaining corrections defendants moved for summary judgment, which

was subject to extensive briefing by the parties.  (Docs. 79, 80, 81, 82, 83, 84, 85, 89,

90, 91, 92, 101.)  The defendants made a number of substantive arguments in support

of the motion, including to attack Peet's Eighth Amendment claims; to argue that

Defendants Palakovich and Zobitne lacked personal involvement in the alleged

constitutional deprivations; to assert that the defendants were entitled to qualified

immunity; and to contend that the plaintiff failed to demonstrate sufficient support for

a state-created danger claim.  The Court subsequently issued a lengthy memorandum

and order granting the defendants' motion for summary judgment with respect to the

plaintiff's substantive due process claims under a state-created danger theory of

liability, but otherwise denied the motion with respect to all remaining claims.  (Doc.

102, 103.)  At the conclusion of the opinion, the Court observed:

> In the end, this is an action involving a tragic set of
> circumstances involving an inmate with a cascading array
> of health problems, chief among them a seizure disorder
> that in March 2008 was unstable.  Those circumstances led
> to the plaintiff suffering an extraordinary set of injuries,
> and lifelong disfigurement, and led to the filing of this

litigation.  Following discovery, we find that the evidence
that has been adduced could support the plaintiff's claims
that the remaining defendants were deliberately indifferent
to his serious medical needs on March 16, 2008, and that
their response to his serious medical condition was dilatory
and inadequate.  That same evidence, however, falls short
of demonstrating that the same defendants affirmatively put
in motion the events that ultimately resulted in the
plaintiff's second seizure, and the injuries that sadly
ensued, or that they took affirmative action to increase the
risk of its occurrence.  Accordingly, the defendants' motion
for summary judgment will be denied with respect to the
plaintiff's Eighth Amendment claims, and granted with
respect to his claims that the defendants violated his
substantive due process.

(Doc. 102, at 56-57.)  At this point, the case was ready for trial on the remaining

claims and was, in fact, scheduled for trial.

As the Court and the parties proceeded forward, the Court convened a

telephonic case-management conference and scheduled the matter for settlement

proceedings before The Honorable William I. Arbuckle, III, of this Court.  That

conference was held on July 30, 2015, and again on August 6, 2015, but was

unsuccessful in resolving the case.  Judge Arbuckle scheduled a follow-up conference

to be held on September 3, 2015.  Almost immediately after this order was entered,

however, the remaining defendants filed what they called a "motion for bifurcation."

(Doc. 110.)  In their brief supporting the motion, the defendants clarified what was

meant by a motion for bifurcation: despite having declined to raise the issue of

administrative exhaustion at any point during the previous five years of litigation after identifying it as a potential affirmative defense, the defendants now urged the Court to "bifurcate the trial and first hold a bench trial on the issue of exhaustion of administrative remedies, which may preclude the necessity for a jury trial altogether." (Doc. 111, at 1.)[1]  In effect, having declined to actively assert this issue at the outset of the case, and having declined to seek early resolution of this case by advancing this affirmative defense through a timely motion for summary judgment filed in September 2014, the defendants belatedly raised the defense on the eve of trial through a "motion for bifurcation."

At the conclusion of the briefing on the motion, the Court scheduled an evidentiary proceeding for October 5, 2015, and directed the parties to submit pre-hearing proposed findings of fact and conclusions of law. (Doc. 118.) Thereafter, the Court suspended the extant case-management deadlines pending a ruling on the

---

[1] What is a further curiosity in this case is that Peet filed a previous action based upon the very same events in this case, and that case was voluntarily dismissed by Peet, pursuant to a stipulation, after the defendants brought up the issue of exhaustion at the outset of the case by way of a motion to dismiss. See Civil No. 3:09-CV-2380 (filed December 3, 2009, and closed on February 25, 2010).  Then Peet filed this action on March 3, 2010, approximately one week after the first action was dismissed.  Despite the issue of exhaustion having been raised promptly in the first action, leading to the closure of that case in a matter of a few short months, the issue was not pressed in any meaningful way in the instant action for more than five years, despite having been included as an affirmative defense in an answer filed on June 24, 2010.

exhaustion issue.  (Doc. 120.)  Prior to the hearing, the parties submitted a stipulation as to facts that the parties agreed were undisputed.  Among those agreed-upon facts were that Peet had received notification of the Pennsylvania Department of Corrections' grievance policies; the applicable grievance procedures necessary to exhaust claims prior to filing a lawsuit in federal court; that Peet knew how to obtain a grievance form; that the facility grievance coordinator could extend the grievance deadline in cases where, such as here, the inmate was temporarily transferred from the facility where the grievance had to be filed; that even after returning to SCI-Camp Hill in March 2009, Peet never requested a grievance form in this case and never submitted a grievance; and that Peet believed he was beyond the time for filing a grievance and so declined to do so, since he is by nature a "laid back guy" who "did not want to make any waves."  (Doc. 121.)  The parties also stipulated that Peet never asked to have the grievance deadlines suspended or enlarged so that he could bring his claims administratively, and therefore "never filed a grievance under the grievance system in effect at the time of his injuries prior to initiating this lawsuit."  (Id. ¶¶ 28-29.)

During the proceeding, no further evidence was presented or introduced, and the parties were in essential agreement on all of the relevant facts, including the fact that prison officials did not take steps to prevent Peet from filing a grievance.  The hearing, therefore, consisted largely of argument by counsel, with the Commonwealth

insisting that Peet's failure to exhaust his administrative remedies compels the dismissal of this action more than five years after it was filed, and with Peet claiming that his failure to exhaust should not be deemed a bar to this litigation because, under the circumstances, he did not have an adequate remedy available to him because he had missed the deadline for filing a grievance, was physically incapable of filing a grievance while he recuperated from his life-threatening injuries within the 15-day time requirement, and therefore to file a grievance would have been futile.

The Court also focused the parties' attention on the case of <u>Drippe v. Tobelinski</u>, 604 F.3d 778 (3d Cir. 2010), and directed them to present argument on its application to the facts and circumstances presented in this particular action, where it appeared that the Commonwealth in essence sought to file a second dispositive motion more than one year after the dispositive motions deadline had expired, and after the Court had adjudicated a comprehensive motion for summary judgment months before.  The Court noted that in <u>Drippe</u>, the Third Circuit Court of Appeals held that a district court abused its discretion after it entertained, on the eve of trial, an oral motion for summary judgment based on the affirmative defense that the plaintiff failed to exhaust his administrative remedies, which was filed seven months after the dispositive motions deadline, without first securing leave of court.  In particular, the Third Circuit ruled that by addressing a motion that had been raised in

10

that fashion, the district court violated Rule 6(b) of the Federal Rules of Civil Procedure, and the appeals court remanded so that the moving party could file "the appropriate motion under Rule 6(b)(1)(B) . . . ." Id. at 779.  We presented this case to the parties for their consideration and reflection on its relevance to this suit.

Upon consideration of the arguments presented by counsel, and finding the current case law in this field to be both clearly established and largely inflexible under the undisputed facts of this case, we are constrained to find that Peet's claims are barred because he failed to exhaust his administrative remedies prior to filing suit – indeed, because he failed to file any grievance at any time, or even to seek leave to file a grievance out of time.  Federal law, as it presently stands and has been interpreted by our court of appeals, compels judgment in the defendants' favor on these undisputed facts.

This result is, however, troubling in this particular case.  It is hard to look past the fact that Peet's original action was dismissed precisely because his failure to exhaust remedies was asserted in a motion to dismiss filed promptly pursuant to Rule 12(b)(6).  Approximately one week after that first suit was dismissed, Peet refiled his claims in this civil action, and not long thereafter the defendants answered the complaint and raised, as an affirmative defense, the possibility that Peet had not exhausted his administrative remedies.   For reasons that are unclear, the

11

Commonwealth declined to pursue this issue further, or to raise this issue in a motion to dismiss, or in a timely filed motion for summary judgment, or indeed at any time within one year after the dispositive motions deadline had run in this action. The defense was raised and then allowed to lay dormant.[2] This defense litigation strategy, in turn, created a Hobson's choice for the plaintiff. He could either abandon his lawsuit in the face of a latent affirmative defense which had not been actively pursued by the defendants, or move forward with this litigation. Over the past five years, Peet pursued the latter course, litigating his legal claims arising from this disfiguring injury.

It was not until the eve of trial – and after more than five years had passed, considerable time had been spent, discovery had been completed, retained experts had furnished reports, and significant expenses had been incurred by the parties – that the defendants filed the "motion for bifurcation", essentially seeking another bite at the dispositive apple in this case. The entire course of this litigation could have been cut short, and expenses significantly curtailed, had the defendants moved for judgment on the basis of an affirmative defense that would, if applicable, have resolved every claim in this case early on.

---

[2] It appears that defendants' counsel may have become aware of the issue, and its potential significance, while they were preparing for trial.

Nevertheless, although we are somewhat troubled by the way in which the defendants have belatedly raised this issue after failing to address it for nearly the entirety of this case – a case that was filed after its predecessor was dismissed because of the plaintiff's acknowledged failure to exhaust his administrative remedies –we find that dismissal is warranted here on the basis of the undisputed facts to which the parties have stipulated. The facts make clear that Peet did not exhaust available administrative remedies prior to filing this action, and the defendants are entitled to judgment in their favor on this threshold issue.  Trial on Peet's claims for liability is therefore unnecessary.

## II.    **DISCUSSION**

### A.    **Administrative Exhaustion Under the PLRA.**

The Prison Litigation Reform Act, 42 U.S.C. § 1997 ("PLRA") requires that prisoners present their claims through an administrative grievance process prior to seeking redress in federal court.  Specifically, the Act provides that:

> No action shall be brought with respect to prison conditions under [§ 1983], or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).  In accordance with the PLRA, prisoners must comply with exhaustion requirements with respect to any claim that arises in the prison setting,

regardless of the type of claim asserted, or the relief sought.  See Porter v. Nussle, 534 U.S. 516, 532 (2002) ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."); Booth v. Churner, 532 U.S. 731, 741 n.6 (2001) ("[A]n inmate must exhaust irrespective of the forms of relief sought and offered through administrative avenues.").

As the statute's language makes clear, the exhaustion of available administrative remedies prior to filing suit is mandatory.  See Nyhuis v. Reno, 204 F.3d 65, 73 (3d Cir. 2000) ("[I]t is beyond the power of this court – or any other – to excuse compliance with the exhaustion requirement, whether on the ground of futility, inadequacy or any other basis.") (quoting Beeson v. Fishkill Corr. Facility, 28 F. Supp. 2d 884, 894-95 (S.D.N.Y. 1998)).  Whether an inmate has exhausted administrative remedies is a question of law that is to be determined by the court, even if that determination requires the resolution of disputed facts.  See Small v. Camden County, 728 F.3d 265, 270-71 (3d Cir. 2013); see also Drippe v. Tobelinski, 604 F.3d 778, 781 (3d Cir. 2010).

Moreover, the exhaustion requirement of the PLRA is one of "proper exhaustion."  Woodford v. Ngo, 548 U.S. 81, 84 (2006).  Failure to comply with the procedural requirements of the available grievance system will result in a claim being

deemed procedurally defaulted. Id. at 90; Spruill v. Gillis, 372 F.3d 218, 227-32 (3d Cir. 2004). An inmate cannot circumvent the PLRA's exhaustion requirement by failing to properly exhaust the prison's administrative review process, or by waiting until such remedies are no longer available to him. Woodford, 548 U.S. at 95. However, if an inmate shows that the actions of prison officials directly caused the inmate's procedural default of a grievance, the inmate will not be held to strict compliance with the exhaustion requirement. Brown v. Croak, 312 F.3d 109, 112-13. Likewise, "[w]here [the inmate] failed to receive even a response to the grievances addressing the . . . incidents, much less a decision as to those grievances, the [administrative remedy] process was unavailable to him." Small v. Camden County, 728 F.3d. at 273. If there is an impediment to an inmate's ability to grieve a matter, the inmate is required to pursue such grievance once the impediment has been removed. Oliver v. Moore, 145 F. App'x 731, 735 (3d Cir. 2005).

In this regard, case law recognizes a clear "reluctance to invoke equitable reasons to excuse [an inmate's] failure to exhaust as the statute requires." Davis v. Warman, 49 F. App'x 365, 368 (3d Cir. 2002). Thus, an inmate's failure to exhaust will only be excused "under certain limited circumstances", Harris v. Armstrong, 149 F. App'x 58, 59 (3d Cir. 2005), and an inmate can defeat a claim of failure to exhaust only by showing "he was misled or that there was some extraordinary reason he was

prevented from complying with the statutory mandate." Davis, 49 F. App'x at 368.

See also Brown v. Croak, 312 F.3d 109, 110 (3d Cir. 2002) (assuming that prisoner

with failure to protect claim is entitled to rely on instruction by prison officials to wait

for outcome of internal security investigation before filing grievance); Camp v.

Brennan, 219 F.3d 279, 281 (3d Cir. 2000) (exhaustion requirement met where Office

of Professional Responsibility fully examined merits of excessive force claim and

uncontradicted correctional officers impeded filing of grievance).

Further, while courts have acknowledged that, in certain limited circumstances,

a failure to exhaust can be excused when "the [administrative remedy] process was

unavailable to [the inmate]," Small v. Camden County, 728 F.3d. at 273, none of the

cases which recognize this exception to the PLRA's total exhaustion requirement

involve the scenario presented here, where the inmate unilaterally and completely

declined to pursue any grievances since he is by nature a "laid back guy" who "did

not want to make any waves." (Doc. 121.) Rather, case law in this field has typically

applied a functional analysis to this issue and measured the functional unavailability

of grievances by examining the institutional response to the inmate's actual efforts to

pursue grievances. Thus, we can find no legal authority which extends this doctrine

to an inmate's unilateral choice to forego any effort to pursue a grievance. Quite the

contrary, case law has consistently held that an inmate's personal sense of the futility

of attempting exhaustion does not excuse compliance with this requirement prescribed by law. <u>Nyhuis v. Reno</u>, 204 F.3d 65, 72 (3d Cir. 2000). In short it seems that an inmate must at least try to exhaust his administrative remedies before it can be said that those remedies are entirely unavailable.

The Department of Corrections maintains a grievance system that offers inmates a three-phase grievance and appeals procedure. <u>See</u> DC-ADM 804; <u>see also</u> 37 Pa. Code § 93.9(a). Pursuant to DC-ADM 804, inmates must first file grievances with the Facility Grievance Coordinator at the facility where the events upon which the complaint is based occurred. If the inmate is dissatisfied with the initial review of his grievance, he may appeal the decision to the Facility Manager (Superintendent). Upon receiving a decision from the Superintendent, the inmate may file an appeal with the Secretary's Office of Inmate Grievances and Appeals (SOIGA) within 15 working days of the Superintendent's decision. <u>Id.</u> The parties have stipulated that during the time period relevant to this action, the DOC's grievance policy provided for four circumstances under which the grievance coordinator could grant an extension of time for an inmate to file a grievance, including a temporary transfer from the facility where the grievance should have been filed.[3] (Doc. 121, ¶ 17.) Again, compliance

---

[3] The other exceptions included a permanent transfer, an authorized temporary absence for an extended period, and delays in mail delivery. (Doc. 121, ¶ 17.)

with the DOC's administrative grievance process is mandatory prior to bringing suit in federal court, and the failure to do so will result in that suit being subject to dismissal pursuant to the clear terms of the PLRA. <u>Nyhuis</u>, 204 F.3d at 73.

**B.    Delay in Seeking Dispositive Relief for a Plaintiff's Failure to Exhaust.**

Although this legal framework is well-settled and familiar to the Court and the parties, we also note that the Third Circuit has, on occasion, expressed reservation about a defendant's belated assertion of the defense, particularly where the defense was not raised within the time limits prescribed by the court for filing a motion for summary judgment. This was the situation presented in <u>Drippe</u>, where a defendant declined to move for summary judgment on the grounds that the plaintiff failed to exhaust administrative remedies prior to filing suit, but instead raised the issue in an oral motion that was lodged on the eve of trial. Indeed, the oral motion was raised after jury selection, immediately prior to trial commencing, and seven months after the deadline the court prescribed for filing dispositive motions. 604 F.3d at 782. Nevertheless, the district court considered the motion, despite it having been filed out of time, and found that the plaintiff's failure to exhaust compelled entry of summary judgment in the defendant's favor in advance of trial. The plaintiff appealed and the Third Circuit reversed. 604 F.3d at 779.

The appellate court's ruling was, however, narrow. The court emphasized that

it does not "read a strict timing requirement into the PLRA for prosecution of the affirmative defense of failure to exhaust." Id. at 781.  The court also noted that district courts enjoy "great deference with regard to matters of case management." Id. at 783. However, the court recognized that "there are times when a district court exceeds the permissible bounds of its broad discretion." Id.  Guided by the Supreme Court's holding in Lujan v. National Wildlife Federation, 497 U.S. 871 (2011), the Third Circuit noted that following Lujan, federal courts have found that Rule 6(b) of the Federal Rules of Civil Procedure imposes a "strict requirement that litigants file formal motions for Rule 6(b) time-extensions when attempting to file in contravention of a scheduling order." Id. at 784.[4]

In light of Lujan and this interpretation of Rule 6(b), the Third Circuit

---

[4] Rule 6(b) provides in relevant part that "[w]hen an act may or must be done within a specified time, the court may, for good cause shown, extend the time: (A) with or without motion or notice if the court acts, or if a request is made, before the original time or its extension expires; or (B) on motion made after the time has expired if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b).

In Lujan, the Supreme Court held that a district court did not abuse its discretion when it declined to permit the introduction of affidavits that were filed untimely and in violation of the district court's scheduling order.  The Court held that Rule 6(b) not only conferred discretion on a district court, but specifically prescribed "the mechanism by which that discretion is to be invoked and exercised." 497 U.S. at 895-96.  The Supreme Court found that after the time for filing a motion has expired, a district court could only "for cause shown" and "in its discretion" extend the time for filing "upon motion." Id. at 896 n.5.

addressed whether the district court's consideration of the defendant's untimely motion for summary judgment, which was raised orally and without request for leave of court, violated Rule 6(b).  The Third Circuit held that to comply with <u>Lujan</u> and the requirements of Rule 6(b)(1)(B), "a party must make a formal motion for extension of time and the district court must make a finding of excusable neglect . . . before permitting an untimely motion."  <u>Id.</u> at 785.  In <u>Drippe</u>, the appeals court could not evaluate the district court's purported finding of excusable neglect since the record was barren of evidence to suggest that the district court had, in fact, made such a finding.  <u>Id.</u>  Instead, the court found that "[t]he District Court's entertainment of [the oral motion to dismiss], some seven months after the scheduling deadline for dispositive motions, does not comply with Rule 6(b) as construed by <u>Lujan</u>."  <u>Id.</u>

In reaching this conclusion, the Third Circuit does not appear to have been simply invoking the strictures of the Rule, but was also clearly influenced by the fact that the way in which the motion was raised – orally, without notice, after a jury had been selected, and immediately before trial was to commence – placed the plaintiff in an unfair position that was the very reason Rule 6(b) prescribes certain procedural requirements for the filing of late motions.  In particular, the Rule requires that late filings must "contain a high degree of formality and precision" in order to "put [ ] the opposing party on notice that a motion is at issue and that he therefore ought to

respond." Id. (quoting Lujan, 497 U.S. at 896 n.5). The court of appeals further observed something particularly relevant to this case: "The resolution of this issue – failure to exhaust administrative remedies – was highly fact-intensive and required a judgment by the District Court whether the specific grievances complied with the specific prison's grievance procedure." Id. The court found that the plaintiff should have had an opportunity to research and brief the issue, and that compliance with Rule 6(b) would have provided that opportunity. Id. Accordingly, the court of appeals reversed the entry of summary judgment, and remanded to allow the defendant to file a motion for an extension of time in compliance with Rule 6(b)(1)(B). Id. at 785-86. That is precisely what the defendant did.

The victory for the plaintiff in Drippe was, ultimately, little more than a procedural and pyrrhic one. On remand, the defendant moved for an extension of time pursuant to Rule 6(b). The district court found that untimely motion for summary judgment could not be considered, and therefore scheduled the matter for trial. However, less than two weeks before trial, the defendant filed a motion to bifurcate trial pursuant to Rule 42(b) of the Federal Rules of Civil Procedure, requesting that the court hold a bench trial on the legal issue of exhaustion, and then hold a jury trial on the issue of liability if necessary. Drippe v. Gototweski, 434 F. App's 79, 81 (3d Cir. 2011). The district court granted that motion, held a short bench

trial on the exhaustion issue, and then found that the plaintiff had not exhausted his claims. The district court consequently dismissed the case, and no trial on liability ever occurred. The plaintiff appealed, asserting among other things that the defendant had waived his right to assert the defense of exhaustion. Id.

The Third Circuit disagreed with the plaintiff's argument and the suggestion that its prior decision provided the plaintiff with any more relief, or that it compelled a finding that the defendant had waived the right to seek relief because of the plaintiff's failure to exhaust administrative remedies:

> Drippe first argues that Gototweski waived the defense of exhaustion by failing to raise it in a timely motion for summary judgment. He asserts that Gototweski did not simply waive his ability to raise this defense on summary judgment, but that this is an affirmative defense that must be raised in pre-trial motion, and by failing to do so, Gototweski waived the defense entirely. In the present case, there is no dispute that Gototweski raised his affirmative defense in his Answer to Drippe's Amended Complaint. That he did not make a timely dispositive motion based upon this affirmative defense in no way means that he waived the defense; instead, he waived only his ability to receive summary adjudication of that defense. The standard for affirmative defenses is that "[f]ailure to raise an affirmative defense by responsive pleading *or* by appropriate motion generally results in the waiver of that defense." Charpentier v. Godsil, 937 F.2d 859, 863 (3d Cir. 1991) (emphasis added). Gototweski raised the affirmative defense in his responsive pleading, and he was, therefore, entitled to pursue this defense at trial, even if he waived the right to summary relief on that claim.

Drippe v. Gototweski, 434 F. App'x 79, 81 (3d Cir. 2011).

In the absence of other authoritative guidance from the court of appeals, these principles control our disposition of this particular case.

### C.     The Defendants Preserved the Exhaustion Defense in Their Answer, and Under Prevailing Law are Permitted to Seek Judgment in Their Favor Prior to a Trial on Liability, Despite Waiting to Present this Issue for Five Years.

Turning to the case at bar, there is no dispute that the defendants raised the exhaustion issue as an affirmative defense in their answer.  (Doc. 23, Answer, ¶ 125.) There is, thus, no question that the defense was technically raised in a timely way and preserved, even if it was not actively pursued throughout the case until the defendants moved to bifurcate – something that Drippe instructs is permissible, and does not result in waiver of the right to have the issue adjudicated by the court, even if it may not technically be done via an untimely motion for summary judgment.

There is also, in the end, no dispute that Peet never exhausted his administrative remedies prior to filing suit.  Despite the tragic circumstances that led to this case being filed, including Peet's painful burns and disfiguring injuries; and despite the fact that Peet spent considerable time in hospital settings and other correctional facilities while he convalesced, Peet never took any steps at any time to file a grievance with prison officials regarding their alleged indifference to his serious medical needs. Although Peet was returned to SCI-Camp Hill in March 2009, and although the

facility's grievance coordinator had the discretion to grant an extension of the 15-day deadline for filing a grievance based on Peet's considerable absence from the facility during his period of convalescence, Peet never requested an extension and never filed a grievance.

Peet now argues that at that time he had no effective remedy. In this regard, Peet advances a textual argument, based upon the then-existing language of the Department of Corrections grievance policy. In particular, Peet argues that the policy in effect at the time of his injury did not expressly allow prison officials to grant extensions of time for the filing of grievances based upon the unusual constellation of circumstances presented here, an inmate injury that resulted in lengthy hospitalization.[5] Therefore, Peet contends that under the written policy grievance relief was unavailable to him.

The difficulty with this textual argument is that it is entirely hypothetical because it is undisputed that Peet never attempted to file a grievance. Given the clear "reluctance to invoke equitable reasons to excuse [an inmate's] failure to exhaust as the statute requires," Davis v. Warman, 49 F. App'x 365, 368 (3d Cir. 2002), repeatedly voiced by the courts, and the settled principle that an inmate's subjective

---

[5]We note that the text of this policy has been subsequently amended to expressly provide greater discretion to prison when considering requests for extension of time to lodge grievances.

sense of the futility of a grievance does not excuse compliance with the law, <u>Nyhuis</u> <u>v. Reno</u>, 204 F.3d 65, 72 (3d Cir. 2000), we are constrained to agree with the defendants that because Peet never sought the relief that could have been available to him under the grievance process – both an extension of the deadline to file, and administrative response to his serious claims – we will never know what may have occurred administratively had Peet filed the grievances and appeals as required under the DOC rules.  And, at this point, what Peet is really arguing is that by the time he filed this lawsuit, he was well beyond the time prescribed for filing a grievance, and thus he had no adequate means of exhausting his claims administratively.  This argument is simply unsupported by the law in this field, which is exacting , admits of few exceptions, and seems to consistently require a prisoner to at least try to exhaust his administrative remedies before it can be said that those remedies are entirely unavailable.

Peet has chalked up his decision not to file a grievance as one consistent with his laid-back personality, and his efforts not to "make waves", but whatever the reason for his failure, they cannot be attributed to prison officials, who are not alleged to have done anything to prevent or even dissuade Peet from filing a grievance.  Peet also never asked to have his grievance deadline extended, and we thus have no way of knowing what response prison officials may have had to Peet's claims and his requests

for relief had they been brought timely.  All we know is that Peet brought this lawsuit without filing even a first-level grievance, and we know that prison officials did not interfere with Peet's right to do so. Given that an inmate's failure to exhaust will only be excused "under certain limited circumstances", Harris v. Armstrong, 149 F. App'x 58, 59 (3d Cir. 2005), and an inmate can defeat a claim of  failure to exhaust only by showing "he was misled or that there was some extraordinary reason he was prevented from complying with the statutory mandate," Davis v. Warman, supra,  49 F. App'x at 368, we are unable to find legal grounds under current case law for excusing this complete failure to even attempt to comply with the PLRA.

Furthermore, in this case the defendants moved to bifurcate trial, just as Gototweski did following the court of appeals' remand in Drippe.  Despite being discomfited with the belated way in which this issue was presented, the Court scheduled an evidentiary proceeding in response to the motion, after the plaintiff had adequate notice and opportunity to present evidence and argument in opposition to the defense.  The parties submitted pre-hearing memoranda, including a joint stipulation of facts and proposed conclusions of law.  Among the facts that the parties stipulated to were the fact that following his injuries and convalescence in both hospitals and other correctional facilities, Peet was returned to SCI-Camp Hill in March 2009, at which time he received a copy of the DOC Inmate Handbook.  It is undisputed that

Peet was thus furnished with the information he needed regarding the various requirements prescribed by the DC-ADM 804 governing inmate grievances. The parties agree that Peet was unable immediately following his injuries to submit a grievance in March 2008, and also that the DC-ADM 804 provided for enlargements of the grievance-filing deadlines under certain circumstances. Peet has testified that he believed that he was out of time to file a grievance, and that in any event he "never filed any grievances because he is a laid back guy and did not want to make any waves." (Doc. 121, ¶ 27.) It is undisputed that Peet never asked to speak with the grievance officer or the Deputy Superintendent at SCI-Camp Hill about securing a waiver of the 15 working day filing requirement for grievances, and that he "never filed a grievance under the grievance system in effect at the time of his injuries prior to initiating this lawsuit." (Id., ¶ 27.)

We are thus left in this case with facts that are wholly unsupportive of Peet's claims that he had no administrative remedy available to him. Peet did, in fact, potentially have administrative remedies available to him. Although Peet's circumstances were extreme and unusual, and resulted in his absence from SCI-Camp Hill for nearly one year while he recovered, the stubborn fact is that he was returned to SCI-Camp Hill, the site of his injuries and the claims he is attempting to prosecute, and that Peet was obliged at that time to at least attempt to seek administrative relief

27

under the DC-ADM 804.   Peet did not do so, and his failure now has dire consequences under the current prevailing law in this field.

As we noted at the outset of this decision, this result is in many ways an unsatisfactory Hobson's choice.  The defendants asserted Peet's failure to exhaust as an affirmative defense in June 2010, just months after raising the issue in Peet's earlier-filed action that was dismissed for precisely the reason presented now.  The parties and the Court have spent years litigating and administering this lawsuit – time and resources that could have been put to other matters had the defendants pursued relief on their affirmative defense early on.  There was never any dispute that Peet failed to exhaust his claims; he has at all times been forthright that he never filed a grievance.  What the parties disputed, apparently, was the significance of this admitted failure.

Yet the court had no opportunity to address the significance of the fact of Peet's non-exhaustion because the issue was never squarely raised and litigated until more than five years had passed, after the dispositive motions deadline had expired,  when the court and parties prepared for an imminent trial.  Yet, as noted above and as is reflected in the Drippe proceedings, the defendants' delay in seeking judgment on the affirmative defense does not result in their waiver of that defense; it merely requires the court to consider the defense in a different procedural framework than would

ordinarily be used when resolving a motion for summary judgment. Yet, this procedural distinction does not yield a substantive difference when the defense is eventually considered.

As noted, the law in this area is strict and largely unyielding, particularly in cases where there is no evidence that any correctional officer or other authority interfered with or prevented an inmate from pursuing administrative relief that is available to him. In this case, Peet did not file any grievance, or seek an extension of the time in which he could do so – relief that was available to him through the DOC's own policies, which were policies with which Peet was familiar. We are compelled, therefore, to conclude that Peet failed to exhaust administrative remedies available to him; the defendants preserved and did not waive their right to seek relief on this affirmative defense; and the undisputed facts regarding Peet's failure to exhaust now compel judgment in the defendants' favor on Peet's remaining claims.[6]

An appropriate order will follow.

_____

[6]We close with a final note to the parties. It has been said that "hard cases make bad law" N. Sec. Co. v. United States, 193 U.S. 197, 364 (1904)(Holmes J., dissenting). All parties acknowledge that the circumstances of this case are undeniably hard. In this setting the parties may well be advised to seek out efforts to avoid making potentially bad law by engaging in further mediation of this case. If the parties wish to follow this course they should jointly notify the court so we can make arrangements to provide them with this opportunity, and defer further filing deadlines in this case, if necessary.

/s/ Martin C. Carlson
Martin C. Carlson
United States Magistrate Judge

Dated: November 25, 2015